## AMERICAN TOBACCO CO. ET AL. *v.* PATTERSON ET AL.

No. 80–1199.   Argued January 19, 1982—Decided April 5, 1982

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and POWELL, REHNQUIST, and O'CONNOR, JJ., joined.   BRENNAN, J., filed a dissenting opinion, in which MARSHALL and BLACKMUN, JJ., joined, *post*, p. 77.   STEVENS, J., filed a dissenting opinion, *post*, p. 86.

*Henry T. Wickham* argued the cause for petitioners American Tobacco Co. et al.   With him on the briefs were *Stephen A. Northup, Paul G. Pennoyer, Jr.,* and *Bernard W.*

*McCarthy. Ronald Rosenberg* argued the cause for petitioners Bakery, Confectionery, and Tobacco Workers International Union et al. With him on the briefs were *Henry Kaiser, Michael H. Gottesman, Jay J. Levit,* and *Laurence Gold.*

*Henry L. Marsh III* argued the cause for respondents Patterson et al. With him on the brief were *Jack Greenberg, James M. Nabritt III, Patrick O. Patterson, Barry L. Goldstein, John W. Scott, Jr.,* and *Randall G. Johnson. David A. Strauss* argued the cause *pro hac vice* for respondent Equal Employment Opportunity Commission. With him on the brief were *Solicitor General Lee, Assistant Attorney General Reynolds, Deputy Solicitor General Wallace, Constance L. Dupre, Philip B. Sklover,* and *Vella M. Fink.**

JUSTICE WHITE delivered the opinion of the Court.

Under *Griggs* v. *Duke Power Co.,* 401 U. S. 424 (1971), a prima facie violation of Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U. S. C. § 2000e *et seq.* (1976 ed. and Supp. IV), "may be established by policies or practices that are neutral on their face and in intent but that nonetheless discriminate in effect against a particular group." *Teamsters* v. *United States,* 431 U. S. 324, 349 (1977). A seniority system "would seem to fall under the *Griggs* rationale" if it were not for § 703(h) of the Civil Rights Act. *Ibid.* That section, as set forth in 42 U. S. C. § 2000e–2(h), provides in pertinent part:

> "Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit

---

*\*Robert E. Williams* and *Douglas S. McDowell* filed a brief for the Equal Employment Advisory Council as *amicus curiae.*

system, . . . provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin, nor shall it be an unlawful employment practice for an employer to give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results is not designed, intended or used to discriminate because of race, color, religion, sex, or national origin. . . ."

Under § 703(h), the fact that a seniority system has a discriminatory impact is not alone sufficient to invalidate the system; actual intent to discriminate must be proved. The Court of Appeals in this case, however, held that § 703(h) does not apply to seniority systems adopted after the effective date of the Civil Rights Act.[1] We granted the petition for certiorari to address the validity of this construction of the section. 452 U. S. 937 (1982).

I

Petitioner American Tobacco Co. operates two plants in Richmond, Va., one which manufactures cigarettes and one which manufactures pipe tobacco. Each plant is divided into a prefabrication department, which blends and prepares tobacco for further processing, and a fabrication department, which manufactures the final product. Petitioner Bakery, Confectionery & Tobacco Workers' International Union and its affiliate Local 182 are the exclusive collective-bargaining agents for hourly paid production workers at both plants.

It is uncontested that prior to 1963 the company and the union engaged in overt race discrimination. The union maintained two segregated locals, and black employees were assigned to jobs in the lower paying prefabrication departments. Higher paying jobs in the fabrication departments

[1] Title VII became effective July 2, 1965, one year after its enactment.

were largely reserved for white employees. An employee could transfer from one of the predominately black prefabrication departments to one of the predominately white fabrication departments only by forfeiting his seniority.

In 1963, under pressure from Government procurement agencies enforcing the antidiscrimination obligations of Government contractors, the company abolished departmental seniority in favor of plantwide seniority and the black union local was merged into the white local. However, promotions were no longer based solely on seniority but rather on seniority plus certain qualifications, and employees lost accumulated seniority in the event of a transfer between plants. Between 1963 and 1968, when this promotions policy was in force, virtually all vacancies in the fabrication departments were filled by white employees due to the discretion vested in supervisors to determine who was qualified.

In November 1968, the company proposed the establishment of nine lines of progression, six of which are at issue in this case. The union accepted and ratified the lines of progression in 1969. Each line of progression generally consisted of two jobs. An employee was not eligible for the top job in the line until he had worked in a bottom job. Four of the six lines of progression at issue here consisted of nearly all-white top jobs from the fabrication departments linked with nearly all-white bottom jobs from the fabrication departments; the other two consisted of all-black top jobs from the prefabrication departments linked with all-black bottom jobs from the prefabrication departments. The top jobs in the white lines of progression were among the best paying jobs in the plants.

On January 3, 1969, respondent Patterson and two other black employees filed charges with the Equal Employment Opportunity Commission alleging that petitioners had discriminated against them on the basis of race. The EEOC found reasonable cause to believe that petitioners' seniority, wage, and job classification practices violated Title VII.

After conciliation efforts failed, the employees filed a class action in District Court in 1973 charging petitioners with racial discrimination in violation of Title VII and 42 U. S. C. § 1981. Their suit was consolidated for trial with a subsequent Title VII action filed by the EEOC alleging both race and sex discrimination. Following trial, the District Court held that petitioners' seniority, promotion, and job classification practices violated Title VII. The court found that six of the nine lines of progression were not justified by business necessity and "perpetuated past discrimination on the basis of sex and race." App. 32. The court enjoined the company and the union from further use of the six lines of progression. The Court of Appeals for the Fourth Circuit affirmed and remanded for further proceedings with respect to remedy, *Patterson* v. *American Tobacco Co.*, 535 F. 2d 257 (1976), and we denied a petition for certiorari. 429 U. S. 920 (1976).

On remand petitioners moved to vacate the District Court's 1974 orders and to dismiss the complaints on the basis of this Court's decision in *Teamsters* v. *United States*, 431 U. S. 324 (1977), which held that § 703(h) insulates bona fide seniority systems from attack even though they may have discriminatory impact on minorities. The District Court denied the motions, holding that petitioners' seniority system "is not a bona fide system under *Teamsters* . . . because this system operated right up to the day of trial in a discriminatory manner." App. 110. A divided panel of the Court of Appeals agreed that "*Teamsters* requires no modification of the relief we approved with regard to . . . lines of progression . . . ," because they were not part of a seniority system within the meaning of § 703(h). 586 F. 2d 300, 303 (1978).

The Court of Appeals reheard the case en banc. It did not decide whether the lines of progression were part of a seniority system. Instead, it held that even if the lines of progression were considered part of a seniority system, "Congress intended the immunity accorded seniority systems by

§ 703(h) to run only to those systems in existence at the time of Title VII's effective date, and of course to routine post-Act applications of such systems." 634 F. 2d 744, 749 (1980).[2] We reverse.

## II

Petitioners argue that the plain language of § 703(h) applies to post-Act as well as pre-Act seniority systems. The respondent employees claim that the provision "provides a narrow exemption [from the ordinary discriminatory impact test] which was specifically designed to protect bona fide seniority systems which were in existence before the effective date of Title VII." Brief for Respondent Patterson et al. 29. Respondent EEOC supports the judgment below, but urges us to interpret § 703(h) so as to protect the post-Act *application* of a bona fide seniority system but not the post-Act *adoption* of a seniority system or an aspect of a seniority system.

As in all cases involving statutory construction, "our starting point must be the language employed by Congress," *Reiter* v. *Sonotone Corp.*, 442 U. S. 330, 337 (1979), and we assume "that the legislative purpose is expressed by the ordinary meaning of the words used." *Richards* v. *United States*, 369 U. S. 1, 9 (1962). Thus "[a]bsent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Consumer Product Safety Comm'n* v. *GTE Sylvania, Inc.*, 447 U. S. 102, 108 (1980). The plain language of § 703(h) is particularly cogent in light of the circumstances of its drafting. It was part of the Dirksen-Mansfield compromise bill which represented "not merely weeks, but months of labor." 110 Cong. Rec. 11935 (1964) (remarks of Sen. Dirksen). As Senator

---

[2] The en banc court remanded the case to the District Court for additional proceedings to determine whether the plantwide seniority system in effect since 1963 is a bona fide seniority system within the contemplation of § 703(h). See 634 F. 2d, at 750. This issue is not before the Court.

Dirksen explained: "I doubt very much whether in my whole legislative lifetime any measure has received so much meticulous attention. We have tried to be mindful of every word, of every comma, and of the shading of every phrase." *Ibid.*

On its face § 703(h) makes no distinction between pre- and post-Act seniority systems, just as it does not distinguish between pre- and post-Act merit systems or pre- and post-Act ability tests. The section does not take the form of a saving clause or a grandfather clause designed to exclude existing practices from the operation of a new rule. Other sections of Title VII enacted by the same Congress contain grandfather clauses, see § 701(b), 78 Stat. 253, as amended, 42 U. S. C. § 2000e–(b), a difference which increases our reluctance to transform a provision that we have previously described as "defining what is and what is not an illegal discriminatory practice . . . ," *Franks* v. *Bowman Transportation Co.*, 424 U. S. 747, 761 (1976), from a definitional clause into a grandfather clause.

The EEOC's position, which is urged by JUSTICE BRENNAN's dissent, is no more supportable. In permitting an employer to "apply" different terms of employment pursuant to a seniority system, § 703(h) does not distinguish between seniority systems adopted before and those adopted after the effective date of the Act. That distinction would require reading § 703(h) as though the reference to a seniority system were followed by the words "adopted prior to the effective date of this section." But the section contains no such limitation. To be cognizable, a claim that a seniority system has a discriminatory impact must be accompanied by proof of a discriminatory purpose.

Furthermore, for the purpose of construing § 703(h), the proposed distinction between application and adoption on its face makes little sense. The adoption of a seniority system which has not been applied would not give rise to a cause of action. A discriminatory effect would arise only when the system is put into operation and the employer "applies" the

system.  Such application is not infirm under § 703(h) unless it is accompanied by a discriminatory purpose.  An adequate remedy for adopting a discriminatory seniority system would very likely include an injunction against the future application of the system and backpay awards for those harmed by its application.  Such an injunction, however, would lie only if the requirement of § 703(h)—that such application be intentionally discriminatory—were satisfied.

Under the EEOC's interpretation of the statute, plaintiffs who file a timely challenge to the adoption of a seniority system arguably would prevail in a Title VII action if they could prove that the system would have a discriminatory impact even if it was not purposefully discriminatory.  *Post,* at 86. See *Griggs* v. *Duke Power Co.,* 401 U. S. 424 (1971).  On the other hand, employees who seek redress under Title VII more than 180[3] days after the adoption of a seniority system—for example, all persons whose employment begins more than 180 days after an employer adopts a seniority system—would have to prove the system was intentionally discriminatory.[4]  Yet employees who prevailed by showing that a bona fide seniority system had a discriminatory impact although not adopted with discriminatory intent would not be entitled to an injunction forbidding the application of the system: § 703(h) plainly allows the application of such a seniority system.

---

[3] Prior to 1972, Title VII generally required charges to be filed within 90 days of an alleged discriminatory practice.  Section 706(e), 78 Stat. 260, was amended in 1972.  It now requires aggrieved persons to file a charge "within one hundred and eighty days after the alleged unlawful employment practice occurred . . . ."  42 U. S. C. § 2000e–5(e).

[4] The facts of this case give rise to just such an anomaly under the EEOC theory.  The respondent employees filed race discrimination charges within 90 days of the adoption of the lines of progression but sex discrimination charges were filed more than 90 days after the adoption. Under the EEOC theory, the lines of progression would be analyzed under two different tests: the *Griggs* impact test and the § 703(h) intentional discrimination test.

A further result of the EEOC's theory would be to discourage unions and employers from modifying pre-Act seniority systems or post-Act systems whose adoption was not timely challenged. Any modification, if timely challenged, would be subject to the *Griggs* standard—even if it benefited persons covered by Title VII—thereby creating an incentive to retain existing systems which enjoy the protection of § 703(h).[5]

Statutes should be interpreted to avoid untenable distinctions and unreasonable results whenever possible. The EEOC's reading of § 703(h) would make it illegal to adopt, and in practice to apply, seniority systems that fall within the class of systems protected by the provision. We must, therefore, reject such a reading.

## III

Although the plain language of § 703(h) makes no distinction between pre-Act and post-Act seniority systems, the court below found support for its distinction between the two in the legislative history. Such an intepretation misreads the legislative history.

We have not been informed of and have not found a single statement anywhere in the legislative history saying that § 703(h) does not protect seniority systems adopted or modified after the effective date of Title VII. Nor does the legislative history reveal that Congress intended to distinguish between adoption and application of a bona fide seniority system. The most which can be said for the legislative history of § 703(h) is that it is inconclusive with respect to the issue presented in this case.[6]

---

[5] "Significant freedom must be afforded employers and unions to create differing seniority systems." *California Brewers Assn.* v. *Bryant*, 444 U. S. 598, 608 (1980). Respondents' interpretation of § 703(h) would impinge on that freedom by discouraging modification of existing seniority systems or adoption of new systems.

[6] JUSTICE BRENNAN's dissent admits that the legislative history "does not contain any explicit reference to the distinction between adoption and

As we have previously described, see *Franks* v. *Bowman Transportation Co.*, 424 U. S., at 759–761, the initial bill[7] passed by the House of Representatives on February 10, 1964, did not contain § 703(h) and neither the bill nor the majority Judiciary Committee Report[8] even mentioned seniority. However, the House Minority Report warned that the bill, if enacted, would destroy seniority. H. R. Rep. No. 914, 88th Cong., 1st Sess., 64–65 (1963). Following a 17-day debate over whether the bill should be referred to committee, the Senate voted to reject the motion to refer it to committee and began to formally consider the merits of the bill on March 30, 1964. Meanwhile, a bipartisan group led by Senators Dirksen, Mansfield, Humphrey, and Kuchel worked to reach agreement on amendments to the House bill which would ensure its passage. Vaas, Title VII: Legislative History, 7 B. C. Ind. & Com. L. Rev. 431, 445 (1966). The Mansfield-Dirksen compromise, which contained § 703(h), was introduced on the Senate floor in the form of a substitute bill on May 26, 1964.[9] Prior to the introduction of the Mansfield-Dirksen substitute, supporters of the House bill responded to charges that it would destroy existing seniority rights.[10] On April 8, 1964, Senator Clark made a speech in

---

application." *Post*, at 83. Nor is there explicit basis for the proposition that § 703(h) applies only to those plans "adopted" prior to the effective date of the Act. It is nevertheless claimed that the legislative history supports reading this distinction into the statute. *Post*, at 83, n. 8. Had Congress intended so fundamental a distinction, it would have expressed that intent clearly in the statutory language or the legislative history. It did not do so, however, and it is not this Court's function "to sit as a super-legislature," *Griswold* v. *Connecticut*, 381 U. S. 479, 482 (1965), and create statutory distinctions where none were intended.

[7] H. R. 7152, 88th Cong., 1st Sess. (1963).

[8] H. R. Rep. No. 914, 88th Cong., 1st Sess. (1963).

[9] 110 Cong. Rec. 11926 (1964).

[10] For examples of charges that the bill would destroy existing seniority rights see, *e. g.*, H. R. Rep. No. 914, *supra*, at 64–66 (Minority Report); 110 Cong. Rec. 486–489 (1964) (remarks of Sen. Hill); *id.*, at 11471 (remarks of Sen. Javits discussing charges made by Governor Wallace).

which he stated that "it is clear that the bill would not affect seniority at all." 110 Cong. Rec. 7207 (1964). In support of his conclusion, he inserted three documents into the Congressional Record which this Court has characterized as "authoritative indicators" of the purpose of § 703(h),[11] *Teamsters* v. *United States*, 431 U. S., at 352, and which the court below relied upon for its conclusion that post-Act seniority systems were not intended to be protected by § 703(h). See 634 F. 2d, at 749–750, n. 5.

The first document was a Justice Department memorandum which stated, in part, that "Title VII would have no effect on seniority rights existing at the time it takes effect."[12] The second document was an interpretive memorandum which had been prepared by Senator Clark and Senator Case, and it also said Title VII would "have no effect on established seniority rights."[13] Senator Clark also introduced written answers to questions propounded by Senator Dirksen which included the statement, "Seniority rights are in no way affected by the bill."[14]

On the basis of the statements that Title VII would not affect "existing" and "established" seniority rights, respondents infer that Title VII would affect seniority rights which were not "established" or "existing" when the Act became ef-

---

[11] Senator Humphrey, one of the drafters of the Mansfield-Dirksen substitute, explained that § 703(h) did not alter the meaning of Title VII but "merely clarifie[d] its present intent and effect." *Id.*, at 12723. Therefore statements made prior to the introduction of § 703(h) by proponents of Title VII are evidence of the meaning of § 703(h).

[12] *Id.*, at 7207. The full text of the statement with respect to seniority may be found in *Franks* v. *Bowman Transportation Co.*, 424 U. S. 747, 760, n. 16 (1976).

[13] 110 Cong. Rec. 7213 (1964). The full text of the statement with respect to seniority may be found in *Franks* v. *Bowman Transportation Co.*, *supra*, at 759, n. 15.

[14] 110 Cong. Rec. 7217 (1964). The questions and answers with respect to seniority may be found in *Franks* v. *Bowman Transportation Co.*, *supra*, at 760–761, n. 16.

fective. Such an inference is unjustified. While the materials which Senator Clark inserted into the Congressional Record did speak in terms of Title VII not affecting "vested," "existing," or "established" seniority rights, they did so because they were responding to a specific charge made by the bill's opponents, namely, that the bill would destroy existing seniority rights. Had Senator Clark intended that the bill not protect post-Act seniority systems, it is highly unlikely he would have stated on the floor of the Senate that "the bill would not affect seniority at all,"[15] 110 Cong. Rec. 7207 (1964), or introduced a written response to a question posed by Senator Dirksen which said:

> "Seniority rights are in no way affected by the bill. If under a 'last hired, first fired' agreement a Negro happens to be the 'last hired,' he can still be 'first fired' so long as it is done because of his status as 'last hired' and not because of his race." *Id.*, at 7217.

Respondents' argument also ignores numerous other references to seniority by proponents of Title VII which were couched in terms of "seniority" rather than "existing seniority rights." See, *e. g., id.*, at 5423 (remarks of Sen. Humphrey); *id.*, at 6564 (remarks of Sen. Kuchel); *id.*, at 6565–6566 (memorandum prepared by House Republican sponsors); *id.*, at 11768 (remarks of Sen. McGovern). In addition, the few references to seniority after § 703(h) was added to the bill are to the effect that "the Senate substitute bill expressly protects valid seniority systems." *Id.*, at 14329 (letter from Sen. Dirksen to Sen. Williams). See also *id.*, at 14331 (remarks of Sen. Williams).

---

[15] Strictly speaking, Senator Clark's statement that Title VII would not affect seniority is incorrect. Title VII does affect seniority rights, for *Franks* v. *Bowman Transportation Co., supra,* allows awards of retroactive seniority to victims of unlawful discrimination. However, Senator Clark's technical error does not alter our conclusion that he and other key proponents of the bill intended that it have minimal impact on seniority systems.

Going behind the plain language of a statute in search of a possibly contrary congressional intent is "a step to be taken cautiously" even under the best of circumstances. *Piper* v. *Chris-Craft Industries, Inc.*, 430 U. S. 1, 26 (1977). "[I]n light of its unusual legislative history and the absence of the usual legislative materials," *Franks* v. *Bowman Construction Co.*, 424 U. S., at 761, we would in any event hesitate to give dispositive weight to the legislative history of § 703(h). More importantly, however, the history of § 703(h) does not support the far-reaching limitation on the terms of § 703(h) announced by the court below and urged by respondents. The fragments of legislative history cited by respondents, regardless of how liberally they are construed, do not amount to a clearly expressed legislative intent contrary to the plain language of the statute. *Consumer Product Safety Comm'n* v. *GTE Sylvania, Inc.*, 447 U. S., at 108.

## IV

Our prior decisions have emphasized that "seniority systems are afforded special treatment under Title VII itself," *Trans World Airlines, Inc.* v. *Hardison*, 432 U. S. 63, 81 (1977), and have refused to narrow § 703(h) by reading into it limitations not contained in the statutory language. In *Teamsters* v. *United States, supra,* we held that § 703(h) exempts from Title VII the disparate impact of a bona fide seniority system even if the differential treatment is the result of pre-Act racially discriminatory employment practices. Similarly, by holding that "[a] discriminatory act which is not made the basis for a timely charge is the legal equivalent of a discriminatory act which occurred before the statute was passed," *United Air Lines, Inc.* v. *Evans*, 431 U. S. 553, 558 (1977), the Court interpreted § 703(h) to immunize seniority systems which perpetuate post-Act discrimination. Thus taken together, *Teamsters* and *Evans* stand for the proposition stated in *Teamsters* that "[s]ection 703(h) on its face immunizes *all* bona fide seniority systems, and does not distin-

guish between the perpetuation of pre- and post-Act" discriminatory impact. *Teamsters*, 431 U. S., at 348, n. 30 (emphasis added).[16] Section 703(h) makes no distinction between seniority systems adopted before its effective date and those adopted after its effective date. Consistent with our prior decisions, we decline respondents' invitation to read such a distinction into the statute.

Seniority provisions are of "overriding importance" in collective bargaining, *Humphrey* v. *Moore*, 375 U. S. 335, 346 (1964), and they "are universally included in these contracts." *Trans World Airlines, Inc.* v. *Hardison, supra,* at 79. See also Aaron, Reflections on the Legal Nature and Enforceability of Seniority Rights, 75 Harv. L. Rev. 1532, 1534 (1962). The collective-bargaining process "lies at the core of our national labor policy . . . ." *Trans World Airlines, Inc.* v. *Hardison, supra,* at 79. See, *e. g.,* 29 U. S. C. § 151. Congress was well aware in 1964 that the overall purpose of Title VII, to eliminate discrimination in employment, inevitably would, on occasion, conflict with the policy favoring minimal

---

[16] Nowhere in *Teamsters* v. *United States* does the Court indicate when the seniority system at issue there was adopted, and examination of the record illustrates the difficulty of fixing an adoption date. Article V of the National Motor Freight Agreement of 1964 contains a seniority provision subject to modification by area agreements and local union riders. See Brief for Petitioner Teamsters, O. T. 1976, No. 75–636, pp. 24–25. However, National Motor Freight Agreements are of 3-year duration, and the 1970 Agreement was in effect when the complaint was filed. If a seniority system ceases to exist when the collective-bargaining agreement which creates it lapses, then the seniority system in *Teamsters* was adopted post-Title VII. On the other hand, if in practice the seniority system was continuously in effect from 1964, it can be argued that its adoption predates Title VII. However, *Teamsters* places no importance on the date the seniority system was adopted, and we follow *Teamsters* by refusing to distinguish among seniority systems based on date of adoption. Given the difficulty of determining when one seniority system ends and another begins and the lack of legislative guidance, we think it highly unlikely Congress intended for courts to distinguish between pre-Act and post-Act seniority systems.

supervision by courts and other governmental agencies over the substantive terms of collective-bargaining agreements. *California Brewers Assn.* v. *Bryant,* 444 U. S. 598, 608 (1980). Section 703(h) represents the balance Congress struck between the two policies, and it is not this Court's function to upset that balance.[17]

Because a construction of § 703(h) limiting its application to seniority systems in place prior to the effective date of the statute would be contrary to its plain language, inconsistent with our prior cases, and would run counter to the national labor policy, we vacate the judgment below and remand for further proceedings consistent with this opinion.[18]

*So ordered.*

JUSTICE BRENNAN, with whom JUSTICE MARSHALL and JUSTICE BLACKMUN join, dissenting.

Purporting to construe the plain language of § 703(h) of Title VII, the Court today holds that seniority plans adopted after Title VII became effective are not subject to challenge under the disparate-impact standard of *Griggs* v. *Duke Power Co.,* 401 U. S. 424 (1971). In failing to distinguish for purposes of § 703(h) between suits challenging the *adoption* of a seniority plan and those challenging its subsequent *application*—a distinction urged by the Equal Employment Opportunity Commission (EEOC)—the Court turns a blind eye to both the language and legislative history of the statu-

---

[17] JUSTICE BRENNAN's dissent makes no mention of the importance which Congress and this Court have accorded to seniority systems and collective bargaining. It reads the legislative history as showing that Congress' basic purpose in enacting § 703(h) was to protect employee expectations. *Post,* at 81–84. In doing so, it ignores the policy favoring minimal governmental intervention in collective bargaining.

[18] All parties agree that on remand the court should decide whether the lines of progression are part of a seniority system, and if so, whether they are bona fide within the meaning of § 703(h). We decline to reach those issues because, as the court below noted, their resolution requires additional factual development. See 634 F. 2d, at 749, n. 3.

tory provision. Section 703(h) is by its very terms of relevance only where the *application* of a seniority plan is challenged. The provision reflects Congress' desire to protect vested seniority rights; Congress did not seek to ensure the vesting of new rights that are the byproduct of discrimination. Because the Court ignores this fundamental distinction between challenges to the adoption, and challenges to the application, of seniority plans, I dissent.

## I

Up until 1963, the American Tobacco Co. and the union serving as collective-bargaining agent for the hourly paid production workers at the company's two Richmond plants openly discriminated on the basis of race with respect to every aspect of employment at the two plants—"job assignments, cafeterias, restrooms, lockers, and plant entrances." *Patterson* v. *American Tobacco Co.*, 535 F. 2d 257, 263 (CA4 1976). White employees were generally assigned to jobs in the fabrication departments; black employees were assigned to lower paying jobs in the prefabrication departments. See *ibid.;* App. 33–34. In 1963, under Government pressure, the company and union altered somewhat the manner of computing seniority and determining promotions. Nevertheless, for the next five years virtually all of the vacancies in the fabrication departments were filled by white employees. Thus, as of 1968, the fabrication departments were still staffed almost entirely by white employees; the prefabrication departments remained predominantly composed of black employees. See 535 F. 2d, at 263.

In 1968, with the assent of the union, the company established nine lines of job progression. Each line generally consisted of two jobs, and one could assume the "top" job only after having worked at least one day in a "bottom" job. Of the six lines of progression at issue here, four consisted of historically white "top" jobs from the fabrication departments linked with historically white "bottom" jobs from the fabrication departments. The remaining two lines involved

"top" jobs from the prefabrication departments linked with historically black "bottom" jobs from the prefabrication departments. Not surprisingly, the District Court determined—and the Court of Appeals agreed—that the six lines of progression were unlawful under *Griggs* v. *Duke Power Co.*, *supra*, because they perpetuated past discrimination on the basis of race and were unsupported by any business justification. See App. 32; 535 F. 2d, at 264. But today this Court, relying on § 703(h) of Title VII, holds that in the event these lines are determined on remand to be part of a seniority system,[1] they must be sustained unless respondents can prove that petitioners acted with discriminatory intent in formulating them.[2]

## II

The Court properly treats this case as one of statutory construction. The language of § 703(h) is as follows:

"[I]t shall not be an unlawful employment practice for an employer to *apply* different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system, . . . provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin . . . ." 78 Stat. 257, as amended, 42 U. S. C. § 2000e–2(h) (emphasis added).

Despite this language, the Court construes § 703(h) to embrace challenges to the *adoption* of seniority systems as well as to their *application*. But § 703(h) describes its own ambit

---

[1] The Court of Appeals assumed, but did not hold, that the lines of progression were part of a "seniority . . . system" within the meaning of § 703(h). See 634 F. 2d 744, 749, and n. 3 (1980).

[2] The District Court, applying *Teamsters* v. *United States*, 431 U. S. 324, 346, n. 28 (1977), apparently made such a finding of discriminatory intent after the petitioners moved to vacate, in light of *Teamsters*, the decree that the court had entered earlier. See App. 110. The Court of Appeals, sitting en banc, did not review this finding, but held instead that § 703(h) is inapplicable to seniority systems adopted after Title VII became effective.

*solely* in terms of application: The provision declares it not unlawful "for an employer *to apply* different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority . . . system." Even if one were able to enlarge the definition of "apply" to include "adopt," it would require a much greater feat of legerdemain to explain how a decision to *adopt* a seniority system can be made "pursuant to" the same seniority system.

It is also significant that § 703(h) refers only to *employers'* practices. Although the *application* of a seniority system is ordinarily the responsibility of the employer alone, the decision to *adopt* a particular plan is made by the employer and the union, both of whom may be liable for employment discrimination under Title VII. See 42 U. S. C. §§ 2000e–2(a), (c). If Congress had intended § 703(h) to shield the *adoption* of a new seniority system, agreed upon by both the employer and union after Title VII became effective, Congress would have referred to unions as well as employers in the exempting provision.[3]

## III

The Court's construction of § 703(h) might be understandable if the legislative history clearly indicated that Congress did not intend to distinguish the adoption of a seniority plan from its subsequent application. But the Court finds no such indication: "The most which can be said for the legislative history of § 703(h) is that it is inconclusive with respect to the issue . . . ." *Ante,* at 71. Viewed in the full context of Title VII, the Court's rejection of a narrow construction of the § 703(h) exemption is truly remarkable.

Through Title VII Congress sought in the broadest terms to prohibit and remedy discrimination. See, *e. g., Franks* v. *Bowman Transportation Co.,* 424 U. S. 747, 763 (1976);

---

[3] It is true, of course, that despite this lack of reference, § 703(h) may in practice afford unions some protection. Section 703(c)(3) of Title VII makes it unlawful for a union "to cause or attempt to cause an employer to discriminate against an individual in violation of this section." 78 Stat. 256, 42 U. S. C. § 2000e–2(c)(3). To the extent that an employer's practice

*Alexander* v. *Gardner-Denver Co.*, 415 U. S. 36, 44 (1974). In order to give this congressional intent its full and proper meaning, Title VII must "be given a liberal interpretation . . . [and] exemptions from its sweep . . . be narrowed and limited to effect the remedy intended." *Piedmont & Northern R. Co.* v. *ICC*, 286 U. S. 299, 311–312 (1932). See also *Spokane & Inland R. Co.* v. *United States*, 241 U. S. 344, 350 (1916); *United States* v. *Dickson*, 15 Pet. 141, 165 (1841). Accordingly, § 703(h) should not be construed to further objectives beyond those which Congress expressly wished to serve. As demonstrated by the legislative history that follows, Congress' basic purpose in adding the provision was to protect the *expectations* that employees acquire through the continued operation of a seniority system. A timely challenge to the *adoption* of a seniority plan may forestall discrimination *before* such legitimate employee expectations have arisen.[4]

Section 703(h) was not included in the early legislative versions of Title VII. It was added only after fears were expressed concerning the possible impact of Title VII on seniority rights and existing seniority systems. See *Franks* v. *Bowman Transportation Co., supra,* at 759.[5] The oppo-

---

does not violate Title VII by virtue of § 703(h), the union's involvement in that practice would not likely be viewed as giving rise to liability under § 703(c)(3).

[4] Currently, a charge of discrimination in violation of Title VII must generally "be filed within one hundred and eighty days after the alleged unlawful employment practice occurred." 42 U. S. C. § 2000e–5(e). At the time the present action arose, charges had to be filed within 90 days of the occurrence of the unlawful employment practice. § 706(d), 78 Stat. 260. Expectations may arise, of course, before a timely charge is filed, but such expectations are hardly substantial. And the notice provided by the filing of charges serves to reduce the likelihood of employees acquiring unjustified expectations concerning seniority rights during any ensuing investigation and litigation of the charges.

[5] As the Court correctly notes, because § 703(h) was merely intended to clarify, not alter, the effect of Title VII, the "statements made prior to the introduction of § 703(h) by proponents of Title VII are evidence of the meaning of § 703(h)." *Ante,* at 73, n. 11.

82

nents of Title VII charged that the Act would "seriously impair . . . [t]he seniority rights of employees in corporate and other employment . . . ." H. R. Rep. No. 914, 88th Cong., 1st Sess., 64–65 (1963) (Minority Report). These opponents apparently believed that if Title VII were adopted, the "benefits which organized labor ha[d] attained through the years would no longer be matters of 'right' . . . ." 110 Cong. Rec. 486 (1964) (statement of Sen. Hill).

The defenders of Title VII responded in strong terms to the charge that "[T]itle VII would undermine the vested rights of seniority." *Id.*, at 7206 (statement of Sen. Clark, quoting Sen. Hill). According to the Act's proponents, this charge was a "cruel hoax . . . generat[ing] unwarranted fear among those individuals who must rely upon their job or union membership to maintain their existence." *Id.*, at 9113 (statement of Sen. Keating). The Act's supporters replied that it was simply untrue that under Title VII "seniority systems would be abrogated and . . . white men's jobs would be taken and turned over to Negroes." *Id.*, at 11471 (statement of Sen. Javits).[6] Thus, with some exaggeration, the proponents of Title VII suggested that Title VII would not affect employees' expectations that arose from the operation of seniority systems.[7]

---

[6] See also 110 Cong. Rec. 1518 (1964) (statement of Rep. Celler) ("It has been asserted also that the bill would destroy worker seniority systems and employee rights vis-a-vis the union and employer. This again is wrong"); *id.*, at 6549 (statement of Sen. Humphrey) ("The full rights and privileges of union membership . . . will in no way be impaired"); *id.*, at 11486 (newsletter from Sen. Humphrey) ("The bill does not permit the Federal Government to destroy the job seniority rights of either union or nonunion employees").

[7] In at least two situations, employee expectations are clearly subject to adjustment and perhaps impairment. First, a violation of Title VII may merit an award of retroactive seniority relief although "such relief diminishes the expectations of other, arguably innocent, employees . . . ." *Franks* v. *Bowman Transportation Co.*, 424 U. S. 747, 774 (1976). Second, where a seniority system is not bona fide within the meaning of § 703(h), both the adoption and application of the system can be challenged.

The interpretive memorandum introduced during the Senate debate by Senator Clark, to which the Court makes reference, *ante*, at 73, only reinforces my view that Congress saw § 703(h) as focusing on the protection of employee *expectations* that develop during the pendency of a seniority plan. The memorandum stated: "Title VII would have no effect on established seniority rights. *Its effect is prospective and not retrospective.*" 110 Cong. Rec. 7213 (1964) (emphasis added).[8] The other two memoranda submitted by Senator Clark, also quoted by the Court, *ante*, at 73, speak in similar terms of protecting vested seniority rights.[9]

While this legislative history does not contain any explicit reference to the distinction between adoption and application urged by the EEOC, it surely contains no suggestion that Congress intended to treat the decision *to adopt* a seniority plan any differently from the decision *to adopt* a discrimina-

---

[8] In quoting the interpretive memorandum, the Court omits the italicized sentence, for obvious reasons. The statement that the effect of Title VII on seniority rights would be "prospective and not retrospective" can be read in two different ways: (1) that, unlike seniority systems adopted prior to the effective date of Title VII, those created after Title VII became effective would be open to challenge on the same grounds as all other employment practices, or (2) that before substantial expectations have arisen through the application of a seniority system, the adoption of the system can be challenged. Both of these readings are inconsistent with the Court's holding in the instant case. Because the language of § 703(h) does not expressly distinguish between seniority systems adopted prior to the effective date, and those adopted after, I am inclined to reject the first interpretation, as is the Court. The second interpretation, however, is consistent with both the language and purposes of § 703(h).

[9] The Justice Department memorandum stated:

"First, it has been asserted that title VII would undermine vested rights of seniority. This is not correct. Title VII would have no effect on seniority rights existing at the time it takes effect." 110 Cong. Rec. 7207 (1964).

The memorandum containing Senator Clark's response to Senator Dirksen's memorandum noted:

"Seniority rights are in no way affected by the bill. . . . The bill is not retroactive, and it will not require an employer to change existing seniority lists." *Id.*, at 7217.

tory employment practice unrelated to seniority. Rather, the legislative history indicates that Congress was concerned *only* about protecting the good-faith expectations of employees who rely on the continued *application* of established, bona fide seniority systems.[10]

## IV

The Court ultimately rejects the EEOC's interpretation of § 703(h) because, in the Court's view, that interpretation is "untenable" and will bring about "unreasonable results." *Ante*, at 71. The reasons underlying the Court's view, unrelated to the language and legislative history of § 703(h), are to my mind without force.

First, the Court suggests that a challenge concerning a seniority system cannot be brought before the application of that system, because "[a] discriminatory effect would arise only when the system is put into operation and the employer 'applies' the system." *Ante*, at 69–70. This reasoning is superficial at best. The Court has recently rejected such reasoning in determining when Title VII's statute of limitations begins to run: " 'The proper focus is upon the . . . *discriminatory acts*, not upon the time at which the *consequences* of the act [become] painful.' " *Delaware State College* v. *Ricks*, 449 U. S. 250, 258 (1980), quoting *Abramson* v. *University of Hawaii*, 594 F. 2d 202, 209 (CA9 1979). See also *Chardon* v. *Fernandez*, 454 U. S. 6, 8 (1981).[11] In any event, the Court's analysis overlooks the *immediate* impact resulting from the

---

[10] In *Franks* v. *Bowman Transportation Co., supra,* the Court reviewed this same legislative history, and similarly concluded that "the thrust of the section is directed toward defining what is and what is not an illegal discriminatory practice in instances in which the post-Act *operation* of a seniority system is challenged as perpetuating the effects of discrimination occurring prior to the effective date of the Act." 424 U. S., at 761 (emphasis added).

[11] It is therefore not surprising that lower courts have held that active employees may challenge a discriminatory retirement plan. See, *e. g., Bartmess* v. *Drewrys U. S. A., Inc.,* 444 F. 2d 1186, 1188 (CA7 1971).

adoption of a particular seniority system in a collective-bargaining agreement: The employees in the bargaining unit are bound by the agreement. See generally *Emporium Capwell Co.* v. *Western Addition Community Organization*, 420 U. S. 50 (1975).

The Court also notes that "[a]n adequate remedy for adopting a discriminatory seniority system would very likely include an injunction against the future application of the system and backpay awards for those harmed by its application." *Ante*, at 70. From this premise the Court concludes that § 703(h) must necessarily cover the adoption of seniority systems. The apparent basis for the Court's leap from this premise to its conclusion is the assumption that "[s]uch an injunction . . . would lie only if the requirement[s] of § 703(h) . . . were satisfied." *Ante*, at 70. But the Court's assumption is undercut by *Franks* v. *Bowman Transportation Co.* In that case the Court rejected the theory that § 703(h) served "to qualify or proscribe relief otherwise appropriate under the remedial provisions of Title VII, § 706(g), 42 U. S. C. § 2000e–5(g)." 424 U. S., at 758. Section 703(h) merely "delineates which employment practices are illegal and thereby prohibited and which are not." *Ibid.* Ignoring the difference between violation and remedy, the Court today adopts the very theory rejected in *Bowman;* it holds that § 703(h) bars a challenge to the adoption of a seniority system because the remedy for a successful challenge to such adoption might resemble the remedy for a challenge to the application of a seniority system.

Finally, the Court offers a policy reason for not distinguishing between adoption and application: that if adoption were not covered by § 703(h), unions and employers would be reluctant to modify "pre-Act seniority systems or post-Act systems whose adoption was not timely challenged." *Ante*, at 71. The Court's foray into the field of policy seems to me to stand as an excellent example of the propriety of deference to agency expertise. For it is obvious that while the modifi-

cation of a pre-existing seniority plan would permit a challenge under the *Griggs* standard to the *modified provision*, the other provisions of the seniority system would continue to receive the protection of § 703(h). Furthermore, to the extent that a pre-existing seniority system is modified to allow protected minorities to overcome prior discrimination, the protection of § 703(h) would not even be necessary; under *Steelworkers* v. *Weber*, 443 U. S. 193 (1979), such affirmative steps taken to assist minorities do not run afoul of any provision of Title VII. And with respect to those modifications not protected under *Weber*, yet violating the *Griggs* standard, adoption should surely be discouraged—not encouraged.

## V

In sum, I find no basis in either the language or legislative history of § 703(h) for protecting the decision to adopt a particular seniority system from timely challenge under *Griggs*. In the instant case, respondents have successfully demonstrated, to the satisfaction of the District Court and Court of Appeals, that the six lines of progression under challenge violate the *Griggs* standard. Because there is some question as to whether the respondent employees timely filed their charges,[12] I would remand the case for further proceedings consistent with this opinion.

JUSTICE STEVENS, dissenting.

Section 703(h) provides an affirmative defense for an employer whose administration of a bona fide seniority or merit system has produced consequences that appear to discrimi-

---

[12] The majority opinion for the Court of Appeals stated that the lines of progression were instituted in January 1968, 634 F. 2d, at 749, some one year before the charges of racial discrimination were filed with the EEOC. But as the opinion for this Court indicates, the facts in the record suggest that the lines of progression were not even proposed until November 1968. *Ante*, at 66. Because it was immaterial to the Court of Appeals whether the lines were adopted in either January 1968 or sometime after November 1968, the court should be given the opportunity to redetermine when they

nate against a member of a particular race, religion, or sex.[1] Thus, for example, if an employee proves that he was denied a promotion to a particular job and that the job was filled by a member of another race or another sex, the employer may defend on the ground that he was implementing a bona fide seniority or merit system. This affirmative defense is available, however, only if the merit or seniority system is "bona fide," regardless of the date on which it was adopted.

It is clear to me that a seniority system that is unlawful at the time it is adopted cannot be "bona fide" within the meaning of § 703(h).[2] Thus, a post-Act seniority system cannot be

---

were adopted. Contrary to the suggestion of the Court, *ante*, at 76, n. 16, such a determination is not difficult; courts routinely determine, for purposes of Title VII's time limitations, when a discriminatory practice was adopted.

[1] The full text of that section provides:

"Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system, or a system which measures earnings by quantity or quality of production or to employees who work in different locations, provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin, nor shall it be an unlawful employment practice for an employer to give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results is not designed, intended or used to discriminate because of race, color, religion, sex or national origin. It shall not be an unlawful employment practice under this subchapter for any employer to differentiate upon the basis of sex in determining the amount of the wages or compensation paid or to be paid to employees of such employer if such differentiation is authorized by the provisions of section 206(d) of title 29." 42 U. S. C. § 2000e–2(h).

[2] Of course, for a merit or seniority system to be "bona fide" it also must be an otherwise neutral, rational system. *Teamsters* v. *United States*, 431 U. S. 324, 353; see also *id.*, at 355–356. In *Teamsters*, the Court held that "an otherwise neutral, *legitimate* seniority system does not become unlawful under Title VII simply because it may perpetuate pre-Act discrimination." *Id.*, at 353–354 (emphasis added). If a seniority system is not "legitimate," it is not "bona fide" within the meaning of the Act.

bona fide if it was adopted in violation of Title VII; such a system would not provide an employer with a defense under § 703(h). Section 703(h) itself does not address the question of how to determine whether the adoption of a post-Act merit or seniority system is unlawful.[3] Since the adoption of a seniority system is in my opinion an employment practice subject to the requirements of Title VII, it is reasonable to infer that the same standard that applies to hiring, promotion, discharge, and compensation practices also applies to the adoption of a merit or seniority system.[4]

This inference is confirmed by the fact that § 703(h) does not merely provide an affirmative defense for seniority systems; it also provides a similar defense for merit systems and professionally developed ability tests. Indeed, the basic standard of Title VII liability was enunciated in a case in which § 703(h) provided a limited affirmative defense. In *Griggs* v. *Duke Power Co.*, 401 U. S. 424, a case involving employer reliance on a "professionally developed ability test," the Court held:

"The Act proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation. The touchstone is business necessity. If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited." *Id.*, at 431.

---

[3] The section simply provides that "[n]otwithstanding any other provision of this subchapter," certain employment practices shall *not* be unlawful. See n. 1, *supra*.

[4] Section 703(a)(2) of the Act provides that it shall be an unlawful employment practice for an employer "to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U. S. C. § 2000e–2(a)(2). The adoption of a seniority system establishes a set of rules that classifies employees in ways that could deprive or tend to deprive an individual of employment opportunities.

The Court in *Griggs* did not suggest that this standard derived from the scope of the affirmative defense afforded to ability tests by § 703(h); rather, the Court concluded that the standard reflected the central "objective of Congress . . . to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of white employees over other employees." *Id.*, at 429–430.

The Court in this case, however, reads the "specific intent" proviso of § 703(h) as though it were intended to define the proper standard for measuring any challenge to a merit or seniority system.[5] This reading of the proviso is entirely unwarranted. The proviso is a limitation on the scope of the affirmative defense. It addresses the problem created by pre-Act seniority systems, which of course were "lawful" because adopted before the Act became effective and therefore presumptively "bona fide" within the meaning of § 703(h). As the legislative history makes clear, Congress sought to protect seniority rights that had accrued before the effective date of the Act, but it did not want to extend that protection to benefits under seniority systems that were the product of deliberate racial discrimination. The obvious purpose of the proviso was to place a limit on the protection given to pre-Act seniority systems. The Court's broad reading of the proviso ignores both its context in § 703(h) and the historical context in which it was enacted.

The Court's strained reading of the statute may be based on an assumption that if the *Griggs* standard were applied to the adoption of a post-Act seniority system, most post-Act systems would be unlawful since it is virtually impossible to establish a seniority system whose classification of employees will not have a disparate impact on members of some race or sex. Under *Griggs*, however, illegality does not follow auto-

---

[5] "To be cognizable, a claim that a seniority system has a discriminatory impact must be accompanied by proof of a discriminatory purpose." *Ante*, at 69.

matically from a disparate impact. If the initiation of a new seniority system—or the modification of an existing system—is substantially related to a valid business purpose, the system is lawful. "The touchstone is business necessity." *Griggs, supra,* at 431; cf. *New York Transit Authority* v. *Beazer,* 440 U. S. 568, 587. A reasoned application of *Griggs* would leave ample room for bona fide systems; the adoption of a seniority system often may be justified by the need to induce experienced employees to remain, to establish fair rules for advancement, or to reward continuous, effective service. I can find no provision of Title VII, however, that grants a blanket exemption to the initiation of every seniority system that has not been conceived with a deliberate purpose to discriminate because of race or sex.

In this case, although I disagree with the reasoning of the Court of Appeals, I would affirm its judgment. That court has held that the six lines of progression at issue violated Title VII because they had a demonstrated disparate impact on protected employees that was not justified by any legitimate business purpose.[6] Although I do not question the applicability of § 703(h) to *bona fide* post-Act seniority systems, that section is not available as a defense in this case because the lines of progression—even if a seniority system—were adopted in violation of Title VII and therefore are not "bona fide."[7]

Accordingly, I respectfully dissent.

---

[6] See *Patterson* v. *American Tobacco Co.,* 535 F. 2d 257, 264–265 (CA4 1976), cert. denied, 429 U. S. 920.

[7] Unlike JUSTICE BRENNAN, I believe that it is unnecessary to remand this case for a determination of whether a challenge to the adoption of the lines of progression was filed timely. See *ante,* at 86 (BRENNAN, J., dissenting). Since in my opinion a seniority system that was adopted in violation of Title VII cannot be "bona fide," such a system is never entitled to the affirmative defense of § 703(h).