**UNITED STATES of America, Plaintiff,**

v.

**PROCEEDS OF the SALE OF 9,312 LBS. OF SCALLOPS, TO WIT, $31,938.84, Defendant.**

**Civ. A. No. 88–0742–WD.**

United States District Court, D. Massachusetts.

May 1, 1990.

As Revised June 11, 1990.

Frank A. Libby, Jr., Asst. U.S. Atty., U.S. Attys. Office, Boston, Mass., for plaintiff.

David Barnet, Barnet and Barnet, New Bedford, Mass., for defendant.

## MEMORANDUM AND ORDER

WOODLOCK, District Judge.

The scallops which spawned this forfeiture action were seized from the F/V ODYSSEY by the plaintiff United States of America ("the government") as undersized catch in violation of the Magnuson Fishery Conservation and Management Act, 16 U.S.C. §§ 1801 *et seq.* They were sold shortly after seizure, and the government seeks forfeiture of the defendant proceeds of the sale—$31,938.84—pursuant to 16 U.S.C. § 1860(a). Claimants Sylvia R. Fishing Corp. and Jose J.A. Cordeiro, respectively the owner and captain of the ODYSSEY, allege improprieties in the seizure of the scallops.

The parties filed cross-motions for summary judgment; I will allow the motion of the United States and deny that of the claimants.

### I

The F/V ODYSSEY normally fishes out of New Bedford for sea scallops in the North Atlantic. The ODYSSEY uses steel dredges to harvest scallops, which are

shucked on board. After the shucked meats are placed in a washer, they are sampled to determine the number of meats per pound, and then placed in muslin bags each holding approximately forty pounds of shucked meats. The bags are placed on ice in pens or compartments in the hold until the vessel reaches port.

On November 20, 1987, the ODYSSEY's captain, claimant Jose J.A. Cordeiro, interrupted a scallop fishing voyage because of bad weather and docked the vessel in Nantucket. 79 bags of scallops had been offloaded into a truck on the pier [1] when two special agents of the National Marine Fisheries Service ("NMFS") approached Captain Cordeiro, identified themselves, and advised him that they intended to conduct a compliance inspection of the ODYSSEY's catch.

The special agents selected ten bags from the truck by pointing to bags located in different parts of the truck. The agents then opened, weighed, and counted the scallops in those bags, and arrived at a final meat count [2] of 54.66 meats per pound for the batch from the truck. Having thus sampled the scallops found in the truck, the agents went into the ODYSSEY's hold, where another 174 bags were stored in the ship's pens.

The agents pointed to or reached into the pens to select bags from different locations. After opening the ten bags selected from the pens, the agents weighed and counted the scallops and arrived at a final meat count of 33.76 meats per pound for that batch. Both inspections occurred in the presence of the ODYSSEY Captain or First Mate; the samples were weighed on an NMFS-issued Ohaus electronic scale which was also calibrated in their presence.

Following agency weighted averaging procedures, the agents determined that the meat count for the entire catch of the ODYSSEY was 40.286 meats per pound. As required by agency policy, the agents rounded the 40.286 meat count up to 40.3 (the next full tenth). On the date of the inspection (November 20, 1987), the maximum permissible average meat count for Atlantic sea scallops was 33 meats per pound.[3] The ODYSSEY's sample so far exceeded the agency's 10% enforcement tolerance ceiling of 36.3 that pursuant to the agency's "percentage forfeiture" policy, 100% of the catch was seized.[4] 50 C.F.R. § 650.21(a); see 16 U.S.C. §§ 1860(a) and 1861(b)(1)(A)(iv).

The agents attempted to find buyers in Nantucket, but failed to receive acceptable bids from three separate seafood merchants. When regional headquarters advised them that they should have better luck in New Bedford, they told Captain Cordeiro that it would be necessary to sail to New Bedford. The scallops from the truck were reloaded onto the vessel, and, under protest of the captain, the ODYSSEY sailed to New Bedford with Coast Guard escort on the following morning (Saturday, November 21, 1987).

In New Bedford, the agents were able to find a buyer (Ocean Obsessions, Ltd.) who agreed to purchase the entire 9,312 pounds of scallops for $3.50 per pound, resulting in proceeds of $32,592.00. However, because the NMFS incurred expenses in the form of lumpers fees for offloading the scallops in New Bedford, it deducted $653.16 pursuant to statute, and the defendant proceeds are thus $31,938.84.

On April 1, 1988, this Court approved the sale, confirmed its terms, and ordered the proceeds deposited with the Court pending disposition of the instant action. Both the government and the claimants now seek to

1. The offloading itself was suspicious, especially in light of the Captain's deposition testimony that a Nantucket buyer named "Charlie" wanted to buy "undersized" scallops and arranged to offload such scallops into the truck.

2. A meat count is the number of scallop meats *required to make a pound;* a count of 30 means thirty meats to the pound. The higher the meat count, the smaller the size of the scallops.

3. See 50 Fed.Reg. 44130 (effective November 18, 1987 through January 31, 1988). The claimants do not dispute that this is the applicable ceiling.

4. 100% seizure was required when a meat count of 40.3 or above was established.

establish their entitlement to the defendant proceeds of the sale.

## II

The claimants seek judgment in their favor on two grounds. First, they claim that the agents did not use scientifically random sampling methods during their inspection so that the results cannot justify a finding that the catch of the ODYSSEY was in violation. Second, they claim that the ODYSSEY was seized when forced to sail to New Bedford, and that this seizure was "conduct egregious enough to taint the entire process, entitling the claimants to the proceeds of the catch." [5] The claimants do not challenge the government's essential case in other respects.

The government's general right to forfeiture—leaving aside sampling method and the forced sailing—is uncontested and uncontestable. Briefly, the Magnuson Fishery Conservation and Management Act, 16 U.S.C. §§ 1801 *et seq.*, was enacted to preserve the nation's fishery resources; a "Fishery Management Plan" (FMP) is prepared for the fish and shellfish within each of eight protected ocean areas. 16 U.S.C. §§ 1852–53. In order to ensure that scallops have a chance to spawn and grow to potential, 50 C.F.R. § 650 establishes a "meat count" standard; a meat count above the permissible level amounts to a violation of 16 U.S.C. § 1857(1). Inspection of scallops is governed by 50 C.F.R. § 650.21, which provides that the inspecting agent

> will take one-pound samples at random from the total amount of scallops in possession. The person in possession of the scallops may request that as many as 10 one-pound samples be examined as a sample group. A sample group fails to comply with the standard if the averaged meat count for the entire sample group exceeds the standard. The total amount of scallops in possession will be presumed in violation of this regulation if

the sample group fails to comply with the standard.

50 C.F.R. § 650.21(a) ("Compliance and sampling procedures;" "shucked meats"). A catch found to be in violation may be seized and sold at fair market value (subject to court approval). 16 U.S.C. §§ 1860(d)(2) and 1861(b)(1)(A)(iv).

It is undisputed that the NMFS, having seized the perishable scallops, had the authority to sell them; [6] the fairness of the terms of the sale and the deduction taken from the proceeds of lumpers fees [7] are likewise uncontested and indeed were affirmed by order of this Court on April 1, 1988.

## A.

The most seriously contested aspect of the inspection is whether the sample was taken "at random" as required by 50 C.F.R. § 650.21(a), *supra*. The claimants suggest both that the search was not at random because of the method used to select bags, and also that the agents violated the requirement of randomness by sampling bags from the truck and from the hold separately.

The claimants have deposed an expert, Dr. Kowalczyk, who testified that certain procedures for taking random samples are statistically acceptable (such as the use of a random numbers table or a random numbers generator). The NMFS agents admittedly did not use any of these technically 'scientific' procedures, although the claimants suggest that it is relatively easy to use a proper scientific method. For example, to use a random numbers table, an agent need only ascertain the number of bags making up the "universe" from which samples would be taken, and select bags as dictated by the table—"eleventh, twentysecond, etc." The use of such a table theoretically prevents the influence of built-in but unrecognized individual biases.

The claimants also suggest that the locations from which the agents selected the

---

5. Memorandum in Support of Claimants' Motion at 9.

6. 15 C.F.R. § 904.505 ("Summary Sale").

7. 16 U.S.C. § 1861(e) as implemented by 15 C.F.R. § 904.505(d).

scallops failed to comport with proper random sampling methodology. For example, the claimants complain that the agent, though unsure exactly how he had taken samples from each bag, selected scallops from the middle of each bag, whereas "to satisfy the requirements of the regulation, not only must the bags of scallops be selected in a random manner, but the scallops must be taken from each bag in a random manner." [8] The claimants also complain that the catch found in the truck was sampled separately from the catch in the hold; the result was that when bags were selected from the truck, there was no possibility a bag from the hold would be selected (and vice versa), violating "the first rule of statistically acceptable random sampling technique which is that every unit in the population has the same chance of being selected." [9]

As support, claimants cite only two authorities: (1) Proposed Rules of the Department of Transportation and (2) a draft-selection case, *United States v. Kotrlik*, 465 F.2d 976 (9th Cir.), *cert. denied* 409 U.S. 1043, 93 S.Ct. 539, 34 L.Ed.2d 493 (1972).

■ In 1988, the Department of Transportation ("D.O.T.") apparently proposed random drug testing of merchant marine personnel; in doing so, it offered a definition of randomness which the claimants suggest supports their position. The uncodified definition provides that

> Random selection means that every member of a given population has an equal chance of selection on a scientifically valid basis. Random selection would be accomplished through the use of a random-number table or computer based, random-number generator.

Federal Register, Vol. 53, No. 131 at 25930, col. 3 ¶ 3 (July 8, 1988) (Proposed Rules of the Dept. of Transportation, 46 C.F.R. §§ 4, 5 & 16). The meaning of "at random" here, however, is wholly unrelated to any proposal for statistically random sampling in the D.O.T. drug testing context. Agencies must be free to tailor their regulations to the particular circumstances of the activities they separately seek to regulate.

■ *Kotrlik* likewise fails to support the claimants. There, the Ninth Circuit affirmed the district court ruling that the draw-from-a-barrel 1969 draft lottery, though "not scientifically perfect, ... was conducted in a perfectly fair manner." 465 F.2d at 977–78. The court below had observed that

> there was no plan, purpose, or pattern in the drawing of the numbers, and hence it was a 'random drawing', as the term random is usually understood and used in ordinary English language.

*Id.* at 977. Here, the claimants suggest that fairness requires the government to adhere strictly to the requirements of a scientific random sampling procedure.

On the contrary, *Kotrlik* endorses deference toward an agency's implementation of a less-than-scientific sampling procedure, so long as that procedure is "random" consistent with the ordinary usage definition of randomness. That is the case here. The claimants themselves concede that the agents selected the bags "by sight with no predetermined order in mind. They just chose them." [10]

The regulation here reads "at random"; it does not use a more particularized phrase such as "according to scientifically random sampling procedures." "Lack of predetermined order" certainly comports with the ordinary meaning of "at random." "[W]ords appearing in statutes are to be given their ordinary meaning." *United States v. Dawlett*, 787 F.2d 771, 774 (1st Cir.1986). The NMFS sampling procedure—adhered to by the agents in this case—reflects the common meaning of the phrase "at random."

Moreover, statutes "should be interpreted to avoid untenable distinctions and unreasonable results whenever possible." *American Tobacco Co. v. Patterson*, 456 U.S. 63, 71, 102 S.Ct. 1534, 1538, 71 L.Ed.2d 748 (1982). In this connection, it bears

---

**8.** Claimants' Opposition at 6.

**9.** Claimants' Opposition at 7.

**10.** Memorandum in Support of Claimants' Motion at 6.

noting that an Administrative Law Judge rejected a virtually identical challenge to the "random" sampling of scallops, concluding that

> The use of random numbers tables and tagging each bag after unloading the whole catch would be impracticable and unacceptable to the industry.... The busy fishermen and dock personnel cannot practically interrupt the flow of work to tag bags and gather them all in a holding area while agents choose the bags with matching serialized numbers to begin their sampling. The added cost of such effort and resulting delay also add to the impracticability of such an approach.

*In the Matter of Jupiter, Inc. and Kenneth R. Rogers,* 4 O.R.W. 410, 415 (NOAA 1985). Reading the regulation as the claimants request would impose an impractical obligation upon NMFS agents that neither Congress nor the agency apparently intended.

Withal, I am obligated to defer to the agency in its construction of the statutory scheme governing its activity. "Deference is owed to specific applications of broad statutory terms by the agency entrusted with the administration of the statute." *Capitol Transportation, Inc. v. United States,* 612 F.2d 1312, 1324 (1st Cir.1979) (citation omitted).

I will give the term "at random" its ordinary (rather than a technical scientific) meaning, and defer to the statutory construction of the agency responsible for enforcing the Magnuson Fishery Conservation and Management Act. Accordingly, I find that the NMFS agents conducted their inspection in accordance with appropriate agency procedure [11]—and "at random" within the meaning of 50 C.F.R. § 650.21.

### B.

■ The claimants also challenge the validity of the seizure and sale of the ODYSSEY's catch on the basis of the order given by the NMFS agents that the ODYSSEY sail from Nantucket to New Bedford. The claimants allege that this forced voyage amounted to an improper seizure of the ODYSSEY which "tainted the entire process," thereby precluding the government from retaining the defendant proceeds.

Without citation, the claimants argue that though the NMFS clearly has the right to seize seafood (and to order a vessel to the nearest port to be offloaded if the seizure occurs at sea), and despite the fact that in appropriate circumstances a vessel might be seized, here only the scallops were properly seized. Thus, they argue, although the seizure was of the scallops and not the ship, "the agents commandeered the vessel, prevented it from sailing to complete her trip, all to the economic detriment of the Claimants. On this basis alone, the forfeiture should fail." [12]

The government responds that the agents were authorized to seize the ODYSSEY, 16 U.S.C. § 1861(b)(A)(iii), since the ODYSSEY was used in connection with harvesting and holding non-conforming scallops.[13] The United States further suggests that it is disingenuous to complain that the boat was detained for approximately 24 hours when the purpose was to reach a fair market for perishable scallops and, in any event, the government could have resorted to the more severe remedy of full seizure of the vessel.[14]

---

**11.** I find that the special agents here conducted their investigation in accordance with the NMFS's "Scalloping Sampling Procedure." Memorandum of 8/31/87, Exh. A to Aff. of Kenneth Crossman. This procedure provides that where two or more portions of the same catch are found in different locations, samples should be taken from each portion of the catch and the count for each portion averaged with the other according to a weighted averaging formula.

**12.** Memorandum in Support of Claimants' Motion at 9.

**13.** Officers authorized to enforce the act may "seize any fishing vessel ... employed in ... the violation of any provision of this Act." It is immaterial whether the scallop Fishery Management Plan contemplates that this statutory power will not ordinarily be used. For present purposes, it suffices to observe that the agents acted within their statutory power.

**14.** It should be noted that although the captain set sail under protest, he apparently did so without requiring the NMFS agents to effect a formal seizure; indeed, the agents indicated that they attempted to accommodate the captain's

The forced sailing in this context hardly amounts to "egregious conduct." I decline to order the proceeds turned over to the claimants on this basis.

### III

Because the seizure of the offending scallops appears to have been conducted in accordance with applicable agency regulations, I conclude that the defendant proceeds of the sale should be forfeited to the United States. Accordingly, I hereby allow the government's motion for summary judgment and deny the claimants' motion.

desire to return the vessel to fishing quickly by accepting the somewhat below auction-price bid for the offending scallops.

It also bears noting that New Bedford was, in fact, the ODYSSEY's home port—the vessel had allegedly docked at Nantucket and not there instead only because of bad weather.