Frederick W. **COUTTS**, et al., Plaintiff,

v.

The **UNITED STATES**, Defendant.

No. 98–181C.

United States Court of Federal Claims.

June 30, 2000.

John M. DiJoseph, Kuvrukov, Mehrotra & DiJoseph, L.L.P., Vienna, Virginia, for plaintiffs.

Bryant S. Banes, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC with whom were Kathryn A. Bleecker, Assistant Director; David M. Cohen, Director; and David W. Ogden, Acting Assistant Attorney General, for defendant. Frank Seales, Jr., Chief Counsel; Lloyd S. Guerci, Assistant Chief Counsel for Litigation; and Coleman R. Sachs, Attorney, Office of Chief Counsel, National Highway Traffic Safety Administration, of counsel.

### OPINION

MARGOLIS, Senior Judge.

This contract action is before the Court on defendant's motion for summary judgment or in the alternative, motion to dismiss, and plaintiffs' cross motion for summary judgment. There are no material facts in dispute. After full briefing and oral argument, plaintiffs' motion is denied. Defendant's motion is granted.

### FACTS

The following facts are in accordance with a Joint Stipulation of Facts (JSF) filed by the parties October 4, 1999.

The complaint and a motion for class certification were filed March 16, 1998, by the following eighteen named plaintiffs: Gayla Barker,[1] Jose Bascunana,[2] Richard P. Chandler, James S. Clements, Frederick W. Coutts, Arthur H. Fletcher, Stephen L. Hatos, Donald G. Heene, Helen E. Jackson, Warren G. LaHeist, Catherine L. Larsen, Almentha Martin, Carl Nash, Henri A. Richardson, Robert H. Ross, Frank Swant, Wayne Tannahill, and Charles Westphal. They are present and former employees of the National Highway Traffic Safety Administration (NHTSA), an agency of the United States Department of Transportation (DOT). On August 25, 1999, plaintiff Hatos filed an unopposed *pro se* motion to withdraw from the case. The Court granted the motion September 8, 1999. JSF, p.1–2.

Plaintiffs' motion for class certification was denied November 10, 1998. Defendant's first motion to dismiss, filed January 8, 1999, was heard and denied May 11, 1999. The order was filed May 12, 1999.

The complaint asserted claims against the United States on breach of contract and estoppel theories with requests for monetary damages as well as declarative and injunctive relief. On May 11, 1999, the Court dismissed plaintiffs' estoppel claim and requests for declaratory and injunctive relief; only the breach of contract claim remains to be decided here.

Plaintiffs have narrowed their claim from asserting an action based on an implied or express contract to a claim based exclusively on an express contract with the Government. Plaintiffs allege that the Federal Workforce Restructuring Act of 1994, Public Law 103–226 [H.R. 3345], March 30, 1994, (FWRA), gave Executive agencies the authority to offer employees voluntary separation incentive payments, but did not authorize the agency to make the payments (buyouts) conditional. Therefore, plaintiffs argue, any buyout offered to employees created a binding contract. Any conditions stated in the buyouts were not authorized by the legislation and thus could not be an enforceable part of the contract.

The FWRA was proposed as an initiative of Vice President Al Gore's National Perfor-

---

1. Ms. Barker's first name was misspelled in the complaint as "Gayle."

2. Mr. Bascunana's last name was misspelled in the complaint as "Bascunans."

mance Review (NPR) that made recommendations for workforce reductions of civilian non-postal employees in a September 7, 1993 report. JSF, p.4, # 14.

As signed into law, Section 3 of the FWRA provides:

(b) AUTHORITY.—

(1) IN GENERAL.—In order to avoid or minimize the need for voluntary separations due to a reduction in force, *reorganization, transfer of function,* or other similar action, and subject to paragraph (2), the head of an agency *may* pay, or authorize the payment of, voluntary separation incentive payments to agency employees—

(A) in any component of the agency;

(B) in any occupation;

(C) in any geographic location; or

(D) on the basis of any combination of factors under subparagraphs (A) through (C).

(2) CONDITION.—

(A) IN GENERAL.—In order to receive an incentive payment, an employee must separate from service with the agency (whether by retirement or resignation) before April 1, 1995.

(B) EXCEPTION.—An *employee who* does not separate from service before the date specified in subparagraph (A) shall be ineligible for an incentive payment under this section unless—

(i) the agency head determines that, in order to ensure the performance of the agency's mission, it is necessary to delay such employee's separation; and

(ii) the employee separates after completing any additional period of service required (but not later than March 31, 1997).

Federal Workforce Restructuring Act of 1994, Public Law 103–226, 108 Stat. 111, 113 (March 30, 1994) (emphasis added).

Later, in addition to the FWRA legislation, on December 19, 1994, President William Clinton and the then Secretary of Transportation, Frederico Peña, announced a plan to restructure five federal agencies, including DOT, as a step in general Government downsizing in response to public demand. The proposed plan for DOT would have consolidated its ten operating administrations into three agencies, the Federal Aviation Administration, the United States Coast Guard, and the Intermodal Transportation Administration (ITA), which would be responsible for programs administered by six of DOT's existing operating administrations, including NHTSA.

On December 23, 1994, DOT issued Volume 1, Number 1 of *DOT Talk,* a biweekly newsletter sent by both electronic mail and in hard copy format to all DOT employees, including plaintiffs, for the stated purpose of keeping them informed of developments resulting from the restructuring plans. A reorganization plan was submitted as a legislative proposal to Congress, but it was never enacted.

On March 30, 1994, Secretary Peña, delegated to the heads of the operating administrations within DOT, including the Administrator of NHTSA, the authority to administer the provisions of the FWRA and to offer buyouts within their organizations. JSF, p.5, # 20; JSF Appendix pp. 9–10.

The operating administration was required to submit a buyout plan to the Deputy Secretary of Transportation for approval. The Deputy Secretary, Mortimer Downey, stated in his memo dated February 28, 1995, that the "[t]entative buyouts may be offered to classes of employees contingent on final determination of departmental restructuring and consolidation." The Administrator of NHTSA, Dr. Ricardo Martinez, submitted the agency's delayed buyout plan to the Deputy Secretary on March 6, 1995. Jan Karicher, the DOT staff member assigned the responsibility of reviewing agency buyout plans to ensure consistency with the Department's objectives, verbally informed Herman L. Simms, then NHTSA's Acting Associate Administrator, that the plan was approved. JSF, pp.6–7; JSF Appendix pp.9–16.

Simms issued a memorandum on March 10, 1995, informing NHTSA employees of three categories of employees to whom delayed buyouts would be offered. All of the plaintiffs held positions covered by category three. The third category included "occupations which may be in excess as a result of

reorganization or restructuring of the department, and other crosscutting occupations such as legal services, public affairs, Congressional/intergovernmental affairs, policy review and evaluation, correspondence control and employees occupying senior level or supervisory positions." JSF, p. 8, # 32; JSF Appendix p. 18. None of the category-three buyouts was necessary to accomplish any of the objectives of the NPR nor would they benefit DOT or NHTSA in the absence of departmental restructuring. JSF, p.12, # 54; JSF Appendix pp. 15–16 & 35–36.

Under guidance provided by the Office of Management and Budget, NHTSA faced the loss of one full-time equivalent position for each employee who received a buyout and its ability to refill positions once they were vacated was severely restricted. NHTSA's senior management expressed concern to agency leadership that NHTSA's ability to perform its mission would be impaired significantly if it were to lose category-three employees unless the restructuring ensued. JSF, p.12, # 55; JSF Appendix p. 35.

Simms' March 10, 1995 memorandum specified that "[m]anagement reserves the right not to proceed with buyouts should the anticipated reengineering and/or restructuring of various segments of the organization not occur, thus, employee services would continue to be required." Each of the plaintiffs received, read, and was familiar with the contents of this memorandum before submitting a completed buyout application. The application was attached to the memorandum. At the time they applied for their respective buyouts, all plaintiffs either understood or were advised that "restructuring" meant the establishment of the ITA. JSF, pp.8–9; JSF Appendix pp. 7, 27–28, 35–36.

All of the plaintiffs completed and signed their buyout application forms and submitted them on or before March 17, 1995, as required. All of plaintiffs' applications were conditionally approved by a letter from Simms dated March 27, 1995. The buyout application signed by each plaintiff, coupled with the letter signed by Simms on behalf of NHTSA, constituted the entire agreement between each of the plaintiffs and NHTSA. The application and the letter each contained

express conditions. The letter made the buyout conditional upon the restructuring, otherwise the "employee services would continue to be required." The buyout application required actual resignation or retirement on the date agreed upon. JSF, pp.9–10, # 43; JSF Appendix pp. 24–26. Plaintiffs were under no obligation to resign as part of the conditional approval nor did they pay any money in connection with the buyout application. JSF, p.11, # 45 & # 46. Without the restructuring of DOT, the government would receive no benefit from the early retirement of plaintiffs. It would, in fact, suffer detriment from the inability to replace necessary employees.

Plaintiff Coutts retired from his position with NHTSA on October 3, 1995. Plaintiff Nash retired on November 3, 1995. Plaintiff Heene retired on December 31, 1995. Plaintiff Martin retired on September 3, 1996. Plaintiff Tannahill retired on November 3, 1996. Plaintiff Swant retired on December 31, 1996. Plaintiffs Westphal and Clements retired on January 3, 1997. Plaintiff Richardson retired on August 2, 1997. Plaintiff Bascunana retired on September 3, 1997. Plaintiffs Barker and Jackson retired on December 30, 1997. Plaintiff LaHeist retired on May 3, 1999. Plaintiffs Chandler, Fletcher, Larsen, and Ross have not retired from their positions with NHTSA. JSF, p.2, # 5. All plaintiffs who retired did so voluntarily and were under no obligation, contractual or otherwise, to retire when they did. JSF, p.15, # 63.

A July 10, 1995 newsletter received and read by all plaintiffs when received or shortly thereafter, advised that NHTSA had offered conditional buyouts to category-three employees in order to maximize its ability to provide assistance to those employees whose positions might be eliminated by DOT restructuring. Employees were advised that NHTSA would defer its decision on the category-three buyouts until 1996. Each of the plaintiffs was also notified of the deferral by a letter dated August 4, 1995, which each plaintiff received and read. JSF, p.13, # 56 & # 57; JSF Appendix p.38.

Early in 1996, NHTSA officials were informed that Congress had taken no action on

the restructuring proposal, and that none was anticipated. NHTSA therefore decided to cancel the conditional buyouts for category-three employees. By a letter dated March 28, 1996, Simms notified each category-three employee who had been given a conditional approval of their buyout applications, that the buyout was thereby canceled. The letter explained that the major condition for approval had been "establishment of the proposed ITA or the implementation of another major reorganization affecting NHTSA staffing," which had not occurred and was no longer planned. JSF, pp.14–15, # 60–62.

### DISCUSSION

#### I. Agency Authority to Condition Buyouts

■ Plaintiffs' position is that NHTSA did not have the authority to condition the plaintiffs' buyouts on the agency's restructuring nor did the agency have the right to cancel the buyouts. Plaintiffs cite *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975) and *American Tobacco Co. v. Patterson*, 456 U.S. 63, 68, 102 S.Ct. 1534, 71 L.Ed.2d 748 (1982) regarding the principles of statutory construction: "[W]e assume that the legislative purpose is expressed by the ordinary meaning of the words used." Plaintiffs then base their argument on *Torres v. Office of Personnel Management*, 124 F.3d 1287 (Fed.Cir. 1997) and *Chevron U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) regarding an agency's authority in implementation of a statute.

In *Torres*, the Court invalidated an Office of Personnel Management (OPM) requirement that restricted eligibility for early retirement annuities to employees who had been employed by the agency for at least thirty days. The statute at issue there, 5 U.S.C. § 8336(d)(2), provided that an employee of specified age and length of service "is entitled to an annuity." It was the direct statutory entitlement that the Court construed in *Torres* as depriving the OPM of

discretion to impose any requirements beyond those designated in the statute.

To the contrary, in this case, the FWRA contains no direct entitlement regarding any government employee. It authorizes. It does not mandate. The discretionary language is, "the head of an agency *may* pay, or authorize the payment of, voluntary separation incentive payments ..." Federal Workforce Restructuring Act of 1994, Pub.L. No. 103–226, § 3(b)(1) (emphasis added). The statute does not mandate the payment of buyouts, but it does set conditions under which the payments are not to be paid. "In order to receive an incentive payment, an employee must separate from service with the agency (whether by retirement or resignation) before April 1, 1995." Federal Workforce Restructuring Act of 1994, Pub.L. No. 103–226, § 3(b)(2)(A). An exception to this cutoff date is set out in the statute. The reason given in the statute for this potential time extension provides insight into the intent of Congress to insure, by the discretion afforded, that the needs of the agency to fulfill its mission be protected:

> An employee who does not separate from service before the date specified in subparagraph (A) shall be ineligible for an incentive payment under this section unless—
>
> (i) the agency head determines that, in order to ensure the performance of the agency's mission, it is necessary to delay such employee's separation; and
>
> (ii) the employee separates after completing any additional period of service required (but not later than March 31, 1997).

Federal Workforce Restructuring Act of 1994, Pub.L. No. 103–226, § 3(b)(2)(B). Thus, the agency has no discretion to offer a payment to an otherwise eligible employee who separates from service with the agency after the final cut-off date of March 31, 1997, as authorized by Congress.[3]

The Court must interpret the language of a statute in accordance with the common

---

**3.** Plaintiffs Coutts and Swant retired from NHTSA on or before the mutually agreed upon separation date. Plaintiffs Coutts, Nash, Heene,

Martin, Tannahill, Swant, Westphal and Clements retired before the March 31, 1997 statutory deadline.

meaning of the words used. As cited by plaintiffs:

> In any event, canons of construction are no more than rules of thumb that help courts determine the meaning of legislation, and in interpreting a statute a court should always turn first to one, cardinal canon before all others. We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there.

*Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 253–54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992).

Use of the word "may," as opposed to "shall," makes the payment of buyouts discretionary. Congress was clearly concerned that the agency's mission be unimpaired by the agency's offering of buyouts. In this case, the agency predicated the buyouts on a plan of restructuring, realizing that its mission might be impaired by the buyouts if the restructuring did not occur. When that eventuality came to pass because Congress failed to pass the legislation that would have implemented the restructuring plan, the buyouts had to be canceled because the employees' services were needed to carry out the mission of the agency.

The Court finds *Chevron, Blue Chip Stamps,* and *American Tobacco* unhelpful to plaintiffs. The language of this statute is clearly discretionary through the use of the word "may." The agency's interpretation of that discretion was in accordance with the intent of Congress when the agency predicated the buyouts on implementation of the agency reorganization plan proposed in Congress.

Second, plaintiffs argue that because conditions are mentioned in the FWRA, the principle that "the expression of one thing is the exclusion of another" is applicable. *Raleigh & Gaston Ry. v. Reid,* 80 U.S. (13 Wall.) 269, 270, 20 L.Ed. 570 (1871); *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978); and *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). Thus, plaintiffs assert that if Congress had wanted to condition buyouts on agency restructuring,

Congress would have said so among the other conditions.

This argument is unpersuasive. Conditions set out in a mandating statute must be distinguished from the limitations set forth in a discretionary statute. Plaintiffs have missed the point that this legislation granted discretion limited only by an end date. That end date establishes the end of the discretion to make buyout payments. Until that date, the words of the statute apply. The agency "may" offer payments; and "may" means that the granting of buyouts is at the discretion of the agency under whatever restrictions it finds appropriate in meeting its own needs as a federal agency. Plaintiffs have not argued, nor could they, that the conditions set were arbitrary or capricious. Plaintiffs argue only that the conditions were not authorized by the legislation. Conditioning the buyouts on a restructuring plan that would alter job descriptions and overall agency organization is entirely reasonable. The need to fill crucial positions within the agency would continue if the restructuring plan was not implemented by Congress.

Plaintiffs admit that the FWRA did not require the agency to offer any buyouts. This fact undercuts plaintiffs' argument that placing conditions on the granting of buyouts would frustrate legislative intent.

*United States v. Testan,* 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976), teaches that plaintiffs may not obtain in the United States Court of Federal Claims monetary damages for benefits of employment which are left to agency discretion when the agency has not chosen, in its discretion, to grant them.

In *Huston v. United States,* 956 F.2d 259 (Fed.Cir.1992), plaintiff argued that the discretion granted, under 5 U.S.C. § 5333(b)(1988) in that case, was constrained by the accompanying regulations and thus became money mandating. *Bradley v. United States,* 870 F.2d 1578 (Fed.Cir.1989) was cited by the plaintiff in *Huston,* but the Federal Circuit disagreed, noting that the *Bradley* statute, 5 U.S.C. § 5349, "commands that 'pay ... shall be fixed and adjusted' " which is mandating language. *Huston,* 956 F.2d at 261. Instead, the Court looked to *Adair v. United States,* 227 Ct.Cl. 345, 648

F.2d 1318 (1981) as the appropriate precedent to apply. In *Adair* the statute, 37 U.S.C. § 313 (1976), was not money mandating, although it set forth "six eligibility requirements plus an overriding discretionary requirement." *Huston,* 956 F.2d at 261 (*citing Adair,* 648 F.2d at 1323). The *Huston* Court makes it clear that the use of "may" in a statute connotes a discretionary intent.

This line of cases draws the clear distinction between money mandating and discretionary legislation as regards the jurisdiction of the Court of Federal Claims. The jurisdiction of the Court of Federal Claims is entirely dependent upon the limits set forth in the Tucker Act's waiver of sovereign immunity. The Tucker Act requires that there be a "claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). For a statute to grant a substantive right it must "fairly be interpreted as mandating compensation by the Federal Government for the damage sustained." *Testan,* 424 U.S. at 400, 96 S.Ct. 948.

Plaintiffs' reliance on *Chevron* is again misplaced. In *Chevron,* ambiguous statutory language was interpreted to accord with the legislative history. In this case, NHTSA was acting under the clearly discretionary language of FWRA when establishing the conditions under which buyouts would be granted to insure the agency's ability to carry out its mission.

The Court finds that the language of the statute was discretionary. The conditions set in the statute were limitations placed on the discretion. Within those limitations, the agency had full discretion to control the buyouts in accordance with the needs of the agency. The agency therefore acted within the legislative authority granted by the FWRA when it conditioned employee buyouts on departmental restructuring. Further, it was acting within the authority granted when it canceled category-three employee buyouts after the plan of restructuring was not implemented, which made the services of

such employees necessary for the agency to continue to fulfill its mission.

Plaintiffs further assert, regarding authority to set conditions of the buyouts, that personnel decisions are not within the agency's area of expertise, and therefore the agency was not authorized to make such decisions. Plaintiffs argue that, "The makeup of the federal workforce is not within NHTSA's jurisdiction or expertise." Pl's. Opp. at 6. Thus, plaintiffs cite the following in support of their argument that the Court should not hesitate to discard flawed agency interpretations.

> [T]he "deference owed to an expert tribunal cannot be allowed to slip into a judicial inertia which results in the unauthorized assumption of major policy decisions properly made by Congress." ... [Courts] must not "rubber-stamp ... administrative decisions inconsistent with a statutory mandate or that frustrates the congressional policy underlying a statute."

*Bureau of Alcohol, Tobacco and Firearms v. Federal Labor Relations Authority,* 464 U.S. 89, 97, 104 S.Ct. 439, 78 L.Ed.2d 195 (1983) (*quoting American Ship Building Co. v. NLRB,* 380 U.S. 300, 318, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965) and *NLRB v. Brown,* 380 U.S. 278, 291–92, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965)).

As stated above, the Court finds that the agency did act within the discretion granted by the FWRA. The statute left it to the agency to decide whether to grant any buyouts at all, which shows that the agency is expected to exercise its judgment as to whether it can offer buyouts and still continue to meet the requirements of the agency's statutory mission. The administrator of an agency knows better than any other person what personnel he needs to meet the needs of his agency's operation. If the DOT was reorganized into fewer departments, the administrator of NHTSA realized that there would be overlapping positions, and buyouts would be appropriate. If the reorganization did not occur, the personnel of category three would continue to be essential to the agency's mission. When the reorganization did not occur, it was appropriate that the buyouts were canceled. The stipulation in

the provisional acceptance of the plaintiffs' buyout applications had been drafted for just that eventuality.

## II. Agency Reorganization as a Buyout Condition

██ Plaintiffs argue that NHTSA's reorganization or its replacement as part of the proposed ITA restructuring was not taken seriously by NHTSA's key officials, and the buyouts were not conditioned on either event until after the buyouts had been unconditionally accepted.

A bill presented by an agency to Congress is a matter to be taken seriously. The buyout statute is about government restructuring; it is even titled the Federal Workforce Restructuring Act. The parties have agreed that the terms reorganization and restructuring are synonymous in this circumstance.

As stipulated to by plaintiffs, Volume 1, Number 12 of "DOT TALK," issued on February 3, 1995, announced to employees that the Secretary had decided to restructure DOT into three agencies: the Federal Aviation Administration, the United States Coast Guard, and the Intermodal Transportation Administration, which would be responsible for programs administered by six of DOT's existing operating administrations, including NHTSA. (Note, this is before the March 27, 1995 letter of conditional buyout approval.) JSF, p.10; JSF Appendix p.25. It was not a vague, unarticulated proposal. In March of 1995, the reorganization plan was submitted as a legislative proposal to Congress. JSF, p.5, # 18 & # 19; JSF Appendix p. 7. Also stipulated to by plaintiffs is the fact that Deputy Secretary Downey's February 28, 1995 memorandum stated that "[t]entative buyouts may be offered to classes of employees contingent on final determination of departmental restructuring and consolidations." JSF, p.6, # 23; JSF Appendix p. 12. (Note, this too was before the conditional approval letter each plaintiff received from Simms dated March 27, 1995.) JSP, p.10, # 42.

Regarding the conditions placed on the buyouts, plaintiffs admit that the form they submitted states a condition that, "If approved for a buyout, DOT retains the right to cancel its approval based on a decision that my services will be critical to its mission." JSF Appendix p. 24. As discussed above, when Congress did not implement the restructuring plan, the positions of category-three employees continued to be necessary for NHTSA to carry out its mission.

It has been stipulated by the parties that, "The buyout application, signed by each plaintiff, coupled with the approval letter, signed by Mr. Simms on NHTSA's behalf, expressed the entire agreement respecting the buyout between each of the plaintiffs and NHTSA." JSF, p. 10, # 42; JSF Appendix pp. 24–26.

The application form signed by each plaintiff stated:

If selected for a buyout, DOT is under no obligation to pay me a buyout until I actually separate by retirement or resignation on the buyout date mutually agreed upon.[4]

JSF, p. 10, # 43; JSF Appendix p. 24.

The March 27, 1995 conditional approval letter stated:

[A]s a category 3 applicant, you are reminded, as stated in the March 10 memorandum, that the buyout is contingent on the impact of the departmental restructuring and consolidation and our approved streamlining plan ... Management reserves the right not to proceed with the buyouts should anticipated reengineering and/or restructuring of various segments of the organization not occur, thus, employee services would continue to be required. These decisions will be made in advance of your approved separation window.

JSF, p.10, # 43; JSF Appendix p. 26.

The Court cannot accept plaintiffs' argument that it was necessary to use any specific language such as, "your continued services are necessary to fulfill the mission of the agency," in advising them that their conditional buyouts were canceled. The language of the March 27, 1995 letter of conditional approval clearly stated, "should anticipated reengineering and/or restructuring of various

---

4. See previous footnote.

segments of the organization not occur, *thus, employee services would continue to be required.*" JSF Appendix p.26 (emphasis added). When combined with the language of the March 28, 1996 cancellation letter saying that condition had come to pass, that is sufficient notice to plaintiffs that their continued services were necessary for the agency to fulfill its mission.

In its May 11, 1999 oral opinion, this Court stated "[T]he Court at this particular stage of the proceeding, cannot say that there is no set of facts that Plaintiffs can prove that would establish that express contracts were created by the agreements to voluntarily retire in return for incentive packages, that the buy-out offers were given by an authorized agent of the Government, and that these contracts were breached when NHTSA withdrew the offers." Tr. 19–20. However, given that opportunity, plaintiffs have failed to prove that a contract with the Government was formed. The Court is of the opinion that a document entitled "Application for Voluntary Separation Incentive Program," is just that, an application. The application, in contract law terms, is an invitation to make an offer to retire before a certain date in exchange for a buyout payment. *See* Richard A. Lord, Williston on Contracts, § 4:6–7 (4th ed.1990). Plaintiffs made an offer to contract with the Government for a buyout by submitting their respective applications. The Government's approval of the application was made conditional. It was therefore a conditional acceptance of the offer to form a contract. Both the invitation to make an offer and the approval were expressly conditional. The condition in both cases stated that the buyout would not occur if the employee's services continued to be critical to the department's mission. When that condition occurred because the restructuring plan was not implemented by Congress, the contract failed to come into being. The Government properly exercised its right to cancel the conditional approval.

The Court finds that there was no obligation on the part of the Government to pay plaintiffs a buyout. It is therefore unnecessary to reach the issue regarding the statutory requirement that separation from service occur prior to March 31, 1997, at the latest.

## III. The *Brown & Williamson* Case

The briefs of the parties did not address the recent Supreme Court case, *Food and Drug Administration v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000), but both parties asserted during oral argument that it supports their position regarding agency authority.

The Court's analysis in *Brown & Williamson* is in accordance with *Chevron*. In *Chevron*, it was established that the reviewing Court first looks to see whether Congress has spoken specifically regarding the issue at hand. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842–43, 104 S.Ct. 2778. In *Brown & Williamson*, the Court noted, however, that the statute at issue may not be considered in isolation. The entire statutory scheme regarding the matter at hand must be consulted when the Court makes its determination. "Such deference is justified because '[t]he responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not judicial ones,' and because of the agency's greater familiarity with the ever-changing facts and circumstances surrounding the subjects regulated." *Brown & Williamson*, 120 S.Ct. at 1300 (internal citations omitted). However, the Court noted that the authority may not be exercised "in a manner that is inconsistent with the administrative structure that Congress enacted into law." *Brown & Williamson*, 120 S.Ct. at 1297 (*citing ETSI Pipeline Project v. Missouri*, 484 U.S. 495, 517, 108 S.Ct. 805, 98 L.Ed.2d 898 (1988)). In *Brown & Williamson*, the Court found that the agency's interpretation of the statute establishing its own jurisdiction to act was incorrect because the agency's interpretation was inconsistent with a distinct statutory scheme Congress had created for addressing that precise subject matter.

In this case, the agency's interpretation of its discretion is ratified by language in the statute itself. The statute makes an exception to the primary cutoff date for buyouts if "the agency head determines that, in order to ensure the performance of the agency's mission, it is necessary to delay such employee's separation." FWRA, (b)(2)(B)(i). The Court reiterates here that none of the category-three buyouts was necessary to accomplish any of the objectives of the NPR, and would not benefit DOT or NHTSA in the absence of departmental restructuring. JSF, p.12, # 54; JSF Appendix pp. 15–16 & 35–36.

Therefore, the Court finds that the agency's interpretation is appropriate when considered in light of the entire legislative scheme regarding Government downsizing.

### CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is granted, and plaintiffs' cross-motion for summary judgment is denied. The Clerk is directed to dismiss plaintiffs' complaint with prejudice. No costs.