OPINION OF THE COURT
STAPLETON, Circuit Judge:
I.
On October 15, 1987, the Philadelphia Electric Company (“PECO”) terminated Mary Lee Whittaker’s electric service for nonpayment of delinquent electric bills totaling $1,594.97. Without electric service, Ms. Whittaker, who at the time resided with two of her adult children and four of her grandchildren, faced a number of hardships. She was unable to use her refrigerator, furnace, or electric lights, and was therefore required to illuminate her home with candles and use her gas stove for heat.
PECO’s policies and practice with respect to providing electric service depend upon the type of customer requesting the service. More specifically, PECO recognizes three types of “new” residential electric service customers. The first group consists of residential customers applying for electric service for the first time. Although Public Utility Commission (“PUC”) regulations allow PECO to require deposits as a condition of electric service for first-time customers, PECO has chosen to pro *792 vide service to new residential customers, whatever their general credit history, without payment of a security deposit.
The second group consists of residential customers applying for reconnection of electric service previously terminated for nonpayment of delinquent bills who have not filed for bankruptcy. Although PECO generally requires such customers to pay all arrearages prior to the restoration of service, as well as a reconnection charge of $20.00, PECO permite its employees to negotiate or otherwise agree to partial payment of arrearages. Moreover, PECO’s policies are subject to PUC regulations which provide for mediation of delinquent bills to determine a partial payment plan.
The third and final group consists of residential customers applying for reconnection of electric service previously terminated for nonpayment of delinquent bills who have filed for bankruptcy. PECO does not request a security deposit from such customers, but rather requires them to make an “adequate assurance of payment” deposit before reconnection of service. The adequate assurance payment is equal to twice the customer’s prior average monthly charge, and must be paid in its entirety before service is restored.
Consistent with these policies, PECO notified Ms. Whittaker that her electric service would be restored upon payment of • $200 on her arrearages and a $20.00 reconnection charge. After mediation with the PUC, the required payment on her arrear-ages was reduced from $200 to $150; she did not pay the $150.00.
Subsequently, on October 29, 1987, Ms. Whittaker filed a bankruptcy petition for relief under Chapter 7 in the United States Bankruptcy Court for the Eastern District of Pennsylvania, listing PECO as a creditor. The next day she applied for reconnection of electric service. Again, consistent with PECO’s policies, she was told that she had to make an adequate assurance payment equal to twice her average monthly usage, or $140.00, plus a reconnection charge of $20.00. Ms. Whittaker could not pay $160.00, however, and on that same day her lawyer made a counteroffer to PECO that Ms. Whittaker pay the $160.00 in three installments: $80.00 by November 30; $40.00 by December 30; and $40.00 by January 30,1989. PECO rejected the counter offer.
Four days later, Ms. Whittaker filed a class action complaint in bankruptcy court; the class was defined as all individuals who were residential customers of PECO, who had filed or would file a voluntary petition for relief pursuant to Chapter 7 or Chapter 13 of Title 11 of the United States Code, and who had had their residential utility service terminated at the time of the filing of the voluntary petition. In addition, she filed a motion for an expedited hearing and preliminary relief, seeking a court order directing PECO immediately to restore service and to accept her offer of adequate assurance payments in installments. At the hearing on the application for preliminary relief, the parties agreed that service would be immediately restored to Ms. Whit-taker’s home and that adequate assurance would be posted through a payment schedule in three installments as previously offered by Ms. Whittaker’s counsel. This agreement was approved by the bankruptcy court.
The class complaint challenged PECO’s policy and practice of demanding that debtors in bankruptcy pay a cash deposit equal to double their average monthly bill as a condition precedent to restoration of service terminated for nonpayment of bills prior to the filing of the petition. The complaint relies primarily on section 366 of the Bankruptcy Code (the “Code”), which provides in pertinent part:
(a) [Ejxcept as provided in subsection (b) of this section, a utility may not alter, refuse, or discontinue service to, or discriminate against, the trustee or the debtor solely on the basis of the commencement of a case under this title or that a debt owed by the debtor to such utility for service rendered before the order for relief was not paid when due.
(b) [S]uch utility may alter, refuse, or discontinue service if neither the trustee nor the debtor, within 20 days after the date of the order for relief, furnishes *793 adequate assurance of payment, in the form of a deposit or other security, for service after such date. On request of a party in interest and after notice and a hearing, the court may order reasonable modification of the amount of the deposit or other security necessary to provide adequate assurance of payment.
11 U.S.C. § 366.
The complaint alleged that PECO’s practices and policies violated § 366 in two distinct respects. First, the class maintained that according to the express language of the statute, PECO could not “refuse” to provide service in the twenty days following the filing of a bankruptcy petition, regardless of whether the service had been terminated pre- or post-petition. Second, it was claimed that PECO’s practice of requiring deposits of twice the average monthly bill only from residential customers in bankruptcy constituted discrimination in violation of the protections afforded in § 366.
In response to these claims, PECO argued that the “refuse” language of § 366 must be interpreted as protecting debtors from the termination of existing service and not as prohibiting the utility from requiring payment of adequate assurance pri- or to the restoration of service. PECO also argued that it did not discriminate against the debtor class because its policy of requiring payment of arrearages in order to restore service to those not in bankruptcy whose service had been terminated was at least equal to, and in most instances more severe than, its policy with respect to customers who were in bankruptcy.
The bankruptcy court certified the class and, after a trial on the merits, granted relief to the plaintiffs.[1] The court held that PECO’s policy of demanding a full adequate assurance payment from members of the plaintiff class as a condition for restoring utility service violated § 366(a) on both the alternative bases advanced by the class. The court further held that Ms. Whittaker was entitled to monetary damages of $20.00 and declaratory and injunc-tive relief on behalf of the class. The district court affirmed the judgment of the bankruptcy court, 92 B.R. 110.
This appeal presents solely issues of law and our standard of review, accordingly, is plenary. See, e.g., Brown v. Pennsylvania State Employees Credit Union, 851 F.2d 81, 84 (3d Cir.1988).
II.
The first issue presented is whether a utility that has terminated service prior to the filing of a bankruptcy petition due to the non-payment of service bills is required by § 366 of the Bankruptcy Code to restore service after a petition for bankruptcy is filed, and before securing payment of adequate assurance if the debtor so requests within 20 days of the order granting relief. Because we conclude that § 366 does impose this duty on a utility, we do not reach, and intimate no view on, the question of whether PECO’s policies also discriminate against debtors within the meaning of § 366.
Our analysis of § 366 must begin, as in all cases of statutory interpretation, with the language of the statute. United States v. Ron Pair Enters., — U.S.-, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989). Section 366(a) expressly stipulates that, except as provided in § 366(b), a utility “may not ... refuse ... service ... solely on the basis ... that a debt owed by the debtor to such utility for service rendered before the order for relief was not paid when due.” Section 366(b) permits a utility to refuse service to a delinquent *794 debtor, but only if the debtor has failed to post adequate assurance of payment for post-petition service during the twenty days immediately following the filing of the order granting relief. When the text of § 366(a) and § 366(b) are read literally and together, they provide that the debtor has 20 days from the order for relief to come to terms on the measure of appropriate assurance and to raise the necessary funds, during which period there can be no refusal of service. Thus, the plain language of these sections requires that service be furnished, without prior payment of adequate assurance, for twenty days from the order for relief if the debtor requests such service.
We conclude that Congress meant what it said. In addition to the literal meaning of the words chosen, we cannot ignore the context in which the word “refuse” appears. Section 366 prohibits three distinct actions; a utility may not “alter, refuse or discontinue service” to the debtor. If the word “refuse” were intended to mean only that the debtor’s service could not be cut off, the phrase “or discontinue service to” would be superfluous. If we give effect to all of the language used, as we are normally constrained to do when construing a statute, we can only conclude that “refuse” was intended to encompass any denial of service for one of the two prohibited reasons, including a denial of restoration of service.
We also believe that reading § 366 literally produces a sensible result consistent with the purposes of the Bankruptcy Code. The subject matter of § 366 received special treatment because Congress recognized both that utility service is essential to a minimally acceptable standard of living and that such services are often available only from a single source. It is not surprising in this context, that Congress would provide the same protection for a debtor whose service is cut off the day before he files a petition as it provided for the debtor who manages to get his petition filed just before his service is terminated. Regardless of the sequence of these two events, Congress apparently wanted a debt- or to have access to essential utility services for a short period of time while avenues for the provision of adequate assurance could be pursued.
PECO argues that a literal interpretation of § 366 cannot be squared with the Code’s legislative history. It views the language of the section as ambiguous, and suggests that the more appropriate interpretation of the provision’s “alter, refuse or discontinue” language is that it affords protection against a utility’s changing the status quo of existing utility service. PECO argues that, although three terms were used, Congress intended to express a single concept of the possible methods of changing the status quo, in much the same manner as Congress used the several terms “contract, combination ... or conspiracy” in Section 1 of the Sherman Act to “present a single concept about concerted action, not three separate ones....” Edward J. Sweeney & Sons v. Texaco, 637 F.2d 105, 111 (3d Cir.1980).
PECO cites two sources of legislative history for its claim. The first is the following explanation of the section contained in both the House and Senate reports:
§ 366 Utility service
This section gives debtors protection from cut-off of service by a utility because of the filing of a bankruptcy case. This section is intended to cover utilities that have some special position with respect to the debtor, such as an electric company, gas supplier, or telephone company that is a monopoly in the area so that the debtor cannot easily obtain comparable service from another utility.
S.Rep. No. 95-989, 95th Cong., 2d Sess. 60 (1978); H.R.Rep. No. 95-595, 95th Cong. 1st Sess. 350 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5846, 6306 (emphasis added).
Second, PECO relies on the following passage from the “Statements By Legislative Leaders” on the final compromise legislation:
Section 366 of the House amendment represents a compromise between comparable provisions contained in H.R. 8200 as passed by the House and the Senate *795 amendment. Subsection (a) is modified so that the applicable date is the date of the order for relief rather than the date of the filing of this petition. Subsection (b) contains a similar change but is otherwise derived from section 366(b) of the Senate amendment, with the exception that a time period for continued service of 20 days rather than 10 days is adopted.
124 Cong.Rec. 32,396 (1978) (statement of Rep. Edwards) (emphasis added). According to PECO, these passages reveal that Congress was concerned solely with protecting debtors from termination of existing service.
We are unpersuaded. First, the Supreme Court has repeatedly declared that “[t]he strong presumption [is] that Congress expresses its intent through the language it chooses.” INS v. Cardoza-Fonseca, 480 U.S. 421, 107 S.Ct. 1207, 1213 n. 12, 94 L.Ed.2d 434 (1987); see also American Tobacco Co. v. Patterson, 466 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982) (“ ‘[0]ur starting point must be the language employed by Congress,’ ... and we assume ‘that the legislative purpose is expressed by the ordinary meaning of the words used.’ ” (quoting Reiter v. Sonotone Corp., 442 U.S. 330, 337, 99 S.Ct. 2326, 2330, 60 L.Ed.2d 931 (1979), and Richards v. United States, 369 U.S. 1, 9, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962))). We agree with the district and bankruptcy courts that the language Congress used in § 366 is unambiguous and explicit, and accordingly that resort to legislative history is not necessary.
Second, even if we were to consider the legislative history in interpreting § 366, the passages relied on by PECO are entirely consistent with the proposition that Congress intended what it literally said. Although the quoted legislative history indicates that Congress was plainly concerned with termination of existing services, it does not demonstrate that this was its sole concern. Nor can it be said that protecting debtors from a refusal to restore services terminated pre-petition undermines the remedy fashioned by Congress for that perhaps primary concern. Indeed, as we heretofore noted, we believe the protection that Ms. Whittaker seeks is entirely consistent with the rationale behind a prohibition of post-petition terminations of service.[2]
PECO further argues that congressional intent to protect against only the cut-off of existing service is manifested by a comparison between the language of § 525(a) of the Code and § 366. Section 525(a), which protects debtors from discriminatory treatment by governmental units, provides in pertinent part:
[A] governmental unit may not deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, a person that is or has been a debtor under this title ... solely because such bankrupt or debtor is or has been a debtor under this title or a bankrupt or debtor under the Bankruptcy Act ... or has not paid a debt that is dischargeable in the case under this title or that was discharged under the Bankruptcy Act.
11 U.S.C. § 525(a) (emphasis added). By focusing on the “refuse to renew a license” language, PECO argues that “if Congress intended to make a plain and unambiguous provision that a utility may not refuse to restore service to a debtor, Congress would have used language equivalent to or substantially similar to the language it used in § 525(a).” Brief at 15. Moreover, PECO *796 reasons that the absence in § 366 of a phrase similar in import to ‘refuse to renew’ in § 525, such as ‘refuse to restore or reconnect,’ evidences that Congress did not intend § 366 to require immediate restoration upon the filing of bankruptcy. Indeed, according to PECO, the difference in treatment between governmental units in § 525 and private interests in § 366 is a sensible one as Congress “understood that it could tell the government, to wit, a government unit, that it must renew or restore a benefit to a debtor but, it could not legislatively compel a private party to supply a service without just compensation to a debtor, without transgressing the guarantees of the ‘due process’ clause and the ‘takings’ clause of the Fifth Amendment.” Brief at 19.
We disagree. PECO’s reliance on § 525 does not lend meaningful support to its interpretation of congressional intent. First, as the district court noted, § 525 speaks to a different type of problem than does § 366; “government permits, covered by § 525, must be periodically renewed, whereas utility service is never ‘renewed.’ Utility service is either ‘altered, refused, or disconnected.' ” Opinion denying reconsideration at 2. Accordingly, Congress would not likely have included the phrase “refuse to renew” or its equivalent to convey its intention to require restoration of utility services.
Second, and more important, the fact that Congress did not include an equivalent phrase to “refuse to renew” in § 366 does not mean that “refuse” in § 366 is ambiguous or that Congress specifically did not intend to protect against “refusal to restore.” Since “a refusal to provide service to a debtor” is clearly broad enough to encompass a refusal to restore service to a debtor, Congress did not have to use a term more explicit than “refuse” in order to convey that it intended to protect against the refusal to restore service.
Finally, we reject the suggestion that the difference between the wording of §§ 366 and 525 reflects a congressional belief that the former would be unconstitutional if read to prohibit utility refusals to restore service. Section 366 does not relieve debtors of the obligation to pay for post-petition service; nor does it provide them with a permanent shield against having to provide adequate assurance of payment for that service.[3] As we read § 366, all that Congress has done is to require that a public utility sell its services to members of the public in its service area for a short period of time without advance payment. Public utility regulation that prescribes when a utility may and may not exact advance payment is common and we doubt that Congress had a concern about the constitutionality of such a regulation even if it had not prohibited post-petition terminations during the 20-day period. However, since we perceive no difference in the constitutional issues raised by a prohibition of such post-petition terminations and a prohibition of refusals to restore service, the fact that Congress clearly did prohibit post-petition terminations confirms that it did not have the constitutional concern that PECO identifies.[4]
III.
The bankruptcy court declined to find PECO guilty of civil contempt and, accordingly, refused to award monetary relief and attorneys’ fees to the class. The district court judge affirmed on this issue observing:
I conclude that the violation of § 366 was not conduct in contempt of a court order. ... [SJection 366 is not comparable *797 to an automatic injunction, nor is it a court order of any kind. Moreover, as seen with the different interpretations of § 366 discussed above, this was heretofore an unsettled area of law in our bankruptcy court. Short of instituting an action for a declaratory judgment, PECO had no way of clarifying the law or the correctness of its policy.
App. at 211-12. We agree and decline to disturb this portion of the judgment.
IV.
PECO asks that we overturn the bankruptcy court’s $20 award of compensatory damages to Ms. Whittaker for the “substantial inconvenience” she experienced as a result of its refusal to provide service. Its primary argument — that it did not violate § 366 — has already been rejected. Its alternative contention that she is entitled to compensatory damages only upon a showing of a willful violation or a finding of contempt was not advanced to the district court and we decline to entertain it.
V.
The judgment will be affirmed. Costs will be taxed to PECO.

. In the bankruptcy court, PECO challenged class certification, and, in particular, challenged any request for an award of damages for unknown class members. The bankruptcy court held that Ms. Whittaker was entitled to maintain the suit as a class action on behalf of all debtors who are residential customers of PECO and who have had their utility service terminated solely due to nonpayment of pre-petition bills as of the time of their filing for bankruptcy or who may be so situated in the future, pursuant to F.R.C.P. 23(b)(2); after discovery at least 64 members of the class were identified. The court further held, however, that class members other than Ms. Whittaker were entitled to in-junctive and declaratory relief only. PECO has not raised the class certification issue in this appeal.

. In a related argument, PECO also urges that a literal interpretation undermines the Act’s purpose because Congress did not intend that debtors receive treatment better than would be accorded them had they not filed for bankruptcy; rather, Congress was concerned that debtors not be treated worse. PECO suggest that a strict interpretation affords debtors an affirmative right or entitlement not contemplated under the Code — they are given a sword where a shield was intended. We find this argument difficult to follow since § 366 concededly gives to debtors who manage to file before termination rights that they would not have if they were not in bankruptcy. As we have noted, a literal reading of the statute does nothing more than put those persons in Ms. Whittaker’s position on a par with those who are able to file before termination.

. PECO correctly argues that it cannot just turn off service at the end of the 20 day period, but rather that under this court’s decision in Begley v. Philadelphia Electric Co., 760 F.2d 46 (3d Cir.1985), it must comply with state laws regarding termination of service; the termination process under these laws can take considerable time, even up to a year. Although this fact goes to the issue of the extent of PECO's exposure to the risk of nonpayment, that exposure is no different whether the utility terminates pre- or post-petition.

. PECO did not argue in the bankruptcy court that § 366, either alone or in conjunction with our decision in Begley, constituted an unconstitutional taking and we express no view on that issue.