**In re ONE STOP REALTOUR PLACE, INC. Debtor.**

**One Stop Realtour Place, Inc., Plaintiff,**

**v.**

**Allegiance Telecom, Inc. and Allegiance Telecom of Pennsylvania, Inc., Defendants.**

**Bankruptcy No. 00–3234KJC.**
**Adversary No. 00–825.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Oct. 17, 2001.

---

David A. Scholl, Media, PA, for debtor/plaintiff.

John F. Cahill, Carter, Ledyard, & Milburn, Washington, DC, for defendants.

Frederic J. Baker, Sr., Philadelphia, PA, Assistant United States Trustee.

## MEMORANDUM OPINION

KEVIN J. CAREY, Bankruptcy Judge.

On November 1, 2000, the debtor filed a complaint against Allegiance Telecom, Inc.[1] asking the Court to order the defen-

---

1. The Debtor filed its complaint in the above-captioned adversary proceeding against Allegiance Telecom, Inc., which is the parent corporation for Allegiance Telecom of Pennsylvania, Inc. ("Allegiance Pennsylvania"). Allegiance Telecom, Inc. and Allegiance Pennsylvania agreed to allow the Debtor to add Allegiance Pennsylvania as a co-defendant to

dant to restore telephone service to the debtor and establish a reasonable adequate assurance payment pursuant to 11 U.S.C. § 366. The debtor also sought the award of actual and punitive damages, including costs and attorney fees, against the defendant pursuant to 11 U.S.C. § 362(h). The defendant filed its answer to the complaint on November 17, 2000. On May 17, 2001, the parties filed a Joint Pretrial Statement and, on the same date, trial was held on the issue of liability, at which the parties presented evidence and argued this matter.[2] The debtor filed its post-trial memorandum of law on May 30, 2001 and Allegiance filed its post-trial memorandum of law and proposed findings of facts on June 15, 2001. Allegiance supplemented its post-trial memorandum of law on June 22, 2001.

### BACKGROUND [3]

One Stop Realtour Place, Inc. ("One Stop" or the "debtor") is a Pennsylvania corporation which was engaged in the business of real estate, insurance and mortgage brokerage. One Stop's president and sole shareholder is Ms. Alfreda Bradford.

Allegiance Pennsylvania is a Local Exchange Carrier[4] and provides local telephone service to commercial customers in Pennsylvania in accordance with tariffs filed with the Federal Communications Commission ("FCC") and the Pennsylvania Public Utility Commission ("PUC"). The parties stipulated that other companies, including Verizon, the Incumbent Local Exchange Carrier, provide the same or equivalent service.

In December 1999, the debtor entered into a Voice Service Order (the "Agreement") with Allegiance for certain telephone services, including local service, calling card and voice mail.[5] Allegiance subsequently provided the debtor with the telephone services described in the Agreement and invoiced the debtor for those services beginning March 2000 and con-

---

the complaint. (Tr. of the trial on May 17, 2001, at p. 4). Allegiance Telecom, Inc. and Allegiance Pennsylvania are hereinafter referred to jointly as "Allegiance."

2. Also considered on May 17, 2001 was the motion of Allegiance to compel the plaintiff-debtor to respond to Allegiance's discovery requests. After reviewing the specific discovery requests in the defendants' request for production of documents with the parties' counsel, I found that the discovery requests were reasonable, not overly broad and that the debtor had not complied with the requests. (Tr. at p. 43). As a result, I did not hear evidence regarding the plaintiff's damage claim at the May 17, 2001 trial, reserving until later, if necessary, the consideration of the extent of any damages. Because I find, for the reasons given below, that the defendants were required to, but did not, comply with 11 U.S.C. § 366, I will enter an order directing the debtor to comply fully with the defendants' discovery requests and schedule a hearing date at which the debtor will be given the opportunity to present evidence regarding compensatory damages.

3. This Memorandum Opinion constitutes the findings of fact and conclusions of law required by Fed. R. Bankr.P. 7052.

4. The term "Local Exchange Carrier" is defined at 47 U.S.C. § 153(26) of the Telecommunications Act of 1996, 47 U.S.C. §§ 251–253. One of the purposes of the Telecommunications Act is to promote competition between incumbent local exchange carriers ("ILEC"), defined at 47 U.S.C. § 251(h), and other telecommunications companies that are attempting to enter and compete for customers in local markets. *TCG Milwaukee, Inc. v. Public Service Comm. Of Wisconsin*, 980 F.Supp. 992, 995 (W.D.Wis.1997).

5. In addition to the Voice Service Order (Exhibit P–2), the debtor also introduced a Full Letter of Authorization (marked as Exhibit P–3) into evidence at the May 17, 2001 trial regarding the debtor's selection of Allegiance as its preferred telecommunications carrier for its local exchange telephone service.

tinuing monthly thereafter. However, the debtor made no payments to Allegiance between March 2000 and August 2000.

On June 29, 2000, Allegiance sent One Stop a notice advising that its service would be suspended unless full payment was received by July 9, 2000.[6] However, no action was taken in July 2000. Allegiance contacted the debtor on August 1, 2000 and, as a result, the debtor tendered a check in the amount of $1,250.00 to Allegiance for a partial payment of the total amount that was due. On August 31, 2000, the debtor's check was returned by the bank to Allegiance because it had been issued on a closed account. Thereafter, the debtor issued a new check to Allegiance in the amount of $1,500.00. The second check in the amount of $1,500.00 was also returned by the bank since it was drawn on the same closed account. On September 1, 2000, Allegiance contacted the debtor about the returned checks. On September 6, 2000, after Allegiance contacted the debtor and advised that service would be suspended unless payment was made by 4 p.m. that day,[7] One Stop used a third party's credit card to pay Allegiance the amount of $2,066.31.

On September 20, 2000, Allegiance suspended the debtor's telephone service.[8] At that time, the debtor owed Allegiance approximately $4,237.37 for telephone service.

On or about September 12, 2000, Ms. Bradford filed a personal chapter 7 bankruptcy petition. On September 25, 2000, Mr. Saline, who was a personal friend of Ms. Bradford, contacted Allegiance regarding Ms. Bradford's chapter 7 bankruptcy filing and faxed Allegiance a copy of the chapter 7 petition.[9] After learning

---

6. Exhibit D–20.

7. *See* Exhibit D–19.

8. The record is unclear about whether Allegiance provided One Stop with proper notice of its intention to suspend service after the September 6, 2000 credit card payment. Ms. Bradford, the debtor's President, testified that the telephone service was terminated about 10 days after the credit card payment was made without any notice or demand for further payment. (Tr. at p. 71.) Ms. Bridges, a collections agent for Allegiance, testified that she sent a written suspension notice on September 6, 2000, but the notice was not introduced into evidence to clarify whether the credit card payment on September 6, 2000 should have been sufficient to avoid suspension. (Tr. at p. 172). Ms. Bridges testified that she spoke to Ms. Bradford on September 18, 2000 and told her that One Stop's check [it is unclear whether Ms. Bridges was talking about the second check for $1,500.00 or another check] had been returned by the bank because the account was closed and that service would be suspended unless One Stop paid the entire outstanding amount, $4,237.53, to Allegiance by 12 noon that day. (Tr. at p. 176). The electronic account notes kept by Allegiance (Exhibit D–19) indicate that Ms. Bridges had a number of conversations on September 18, 2000 regarding the One Stop account with "customer," "Mr. Larry Brown," "Mark Manuel" and "Ms. Bradford." Even assuming that Ms. Bridges had spoken Ms. Bradford and others on September 18, 2000, it is unclear whether this notice would be sufficient under the applicable tariff, which requires seven (7) days notice to a customer prior to suspension of service. (Exhibit D–2, Section 2.4.4(A)). Whether Allegiance properly terminated One Stop's service is not an issue that I need resolve to dispose of the issues raised in the Complaint because, under Section 366 and the Third Circuit Court of Appeals decision in *In re Whittaker*, 882 F.2d 791 (3d Cir.1989), a utility may not "refuse" a request for service by a bankruptcy petitioner that is made within 20 days of the bankruptcy filing, regardless of whether the service was terminated pre-petition. *Whittaker*, 882 F.2d at 795. I, therefore, express no view on the adequacy of any termination notice to One Stop.

9. *See* Tr. at pp. 95–97, p. 137 and Exhibit D–19. Ms. Diane Shelton, a collections manager for Allegiance, testified that Mr. Saline represented to her that he was a vice president of One Stop. Tr. at p. 138. However,

that her personal chapter 7 bankruptcy filing would not result in the restoration of debtor's telephone service, Ms. Bradford filed a *pro se* chapter 11 bankruptcy petition for One Stop on October 2, 2000.[10] Ms. Bradford testified that she called Allegiance immediately and left a voice mail message for Ms. Shelton regarding the chapter 11 filing.[11] Ms. Bradford also testified that she faxed a copy of the chapter 11 petition to Allegiance.[12] However, the Allegiance employees who testified said that they were not told about One Stop's chapter 11 filing and never received a fax copy of the chapter 11 petition.[13] Ms. Shelton's written account record noted a contact from Mr. Saline and Ms. Bradford on October 3, 2000, but does not mention notice of a chapter 11 bankruptcy filing.[14] Ms. Shelton's notes show that Ms. Bradford requested that service be restored and that Ms. Shelton asked for a deposit of $2,300.00, equivalent to three months of One Stop's average monthly bills, to restore the service. Ms. Shelton also asked to speak to One Stop's legal counsel, but was told that One Stop did not have counsel. The electronic account record ends with the statement "we will NOT RESTORE SERVICE WITHOUT CASH DEPOSIT OF $2300." [15] No deposit was made and Allegiance did not restore One Stop's telephone service at that time.

On October 24, 2000, Mr. David Scholl, One Stop's present counsel, contacted Ms. Bridges on behalf of One Stop and was referred to Ms. Latia Black, an administrative assistant in the Allegiance legal department. Mr. Scholl advised Ms. Black that One Stop had filed a chapter 11 bankruptcy petition and requested that telephone service be restored. On November 2, 2000, Mr. Scholl provided Allegiance with a copy of the complaint in this adversary proceeding. On November 3, 2000, in accordance with an agreement between counsel, Allegiance restored telephone service to One Stop, pending receipt by Allegiance of adequate assurances.[16]

On February 7, 2001, One Stop's chapter 11 bankruptcy case was converted to a chapter 7 case.[17] Also on February 7, 2001, Allegiance suspended One Stop's telephone service based on the debtor's failure to make post-petition payments and adequate assurance payments to Allegiance.

The parties have stipulated to the following facts: One Stop was aware that alternative telephone service providers were available during the period of time when Allegiance suspended service. One Stop contacted Verizon for telephone service, but did not enter into any contract for alternative service. During the period that telephone service was suspended by Allegiance, Ms. Bradford had access to her

Ms. Bradford testified that Mr. Saline was not an officer of the debtor, but was helping her due to the problems she was having with Allegiance. Tr. at p. 74.

10. Tr. at p. 74 and p. 97.

11. Tr. at p. 75.

12. Tr. at p. 75.

13. Tr. at pp. 139–40; Tr. at pp. 177–78.

14. Exhibit D–19.

15. Exhibit D–19 (emphasis in original).

16. Joint Pretrial Statement, p. 3 at ¶ 14.

17. After conversion of the case to chapter 7, the debtor moved for and obtained abandonment by the trustee of the claims it is pursuing in this adversary proceeding (Order of May 10, 2001, docket entry # 65). On June 27, 2001, the chapter 7 trustee filed a "Notice of change from asset to no asset case" (docket entry # 70) and a "Report of No Assets" (docket entry # 71).

cellular telephone and her residential telephone service.

## *DISCUSSION*

In its complaint, the debtor argues that Allegiance wrongly refused to restore telephone service upon the filing of debtor's chapter 11 petition as required by Section 366 of the Bankruptcy Code, 11 U.S.C. § 366, and that this refusal was a willful violation of the automatic stay of Sections 362(a)(1) and (a)(6) of the Bankruptcy Code, 11 U.S.C. § 362(a)(1) and (6). To resolve the issues raised by the debtor's complaint, I must decide: (1) whether Allegiance is a "utility" that is subject to Section 366 of the Bankruptcy Code; (2) if Allegiance is a "utility," whether Allegiance was required to restore service to the debtor even before the debtor provided Allegiance with an adequate protection payment; and (3) whether Allegiance's failure to restore service upon the debtor's filing of a chapter 11 bankruptcy petition was a willful violation of Section 362 of the Bankruptcy Code.

I. *Allegiance is a "utility" within the definition of 11 U.S.C. § 366.*

■ Section 366 of the Bankruptcy Code provides:

(a) Except as provided in subsection (b) of this section, a utility may not alter, refuse, or discontinue service to, or discriminate against, the trustee or the debtor solely on the basis of the commencement of a case under this title or that a debt owed by the debtor to such utility for service rendered before the order for relief was not paid when due.

(b) Such utility may alter, refuse, or discontinue service if neither the trustee nor the debtor, within 20 days after the date of the order for relief, furnishes adequate assurance of payment, in the form of a deposit or other security, for service after such date. On request of a party in interest and after notice and a hearing, the court may order reasonable modification of the amount of the deposit or other security necessary to provide adequate assurance of payment.

11 U.S.C. § 366. The term "utility" is not defined in the Bankruptcy Code, but its ordinary meaning is "a service (such as light, power, or water) provided by a public utility." [18] The term "public utility" is defined as "a business organization (as an electric company) performing a public service and subject to special governmental regulation." [19]

When Congress enacted Section 366 as part of the Bankruptcy Code in 1978, it wrote: "this section is intended to cover utilities that have some special position with respect to the debtor, such as an electric company, gas supplier, or telephone company that is a monopoly in the area so that the debtor cannot easily obtain comparable service from another utility." House Report No. 95–595, 95th Cong., 1st Sess, p. 350 (1977), U.S.Code Cong. & Admin.News, 1978, pp. 5787, 6306. Allegiance relies upon this language in the legislative history to argue that it cannot be a "utility" within the meaning of Section 366 because it is not a "monopoly;" the debtor had alternate telephone service available to it. Some courts, after reviewing this legislative history, have recognized that Section 366 treated utility services differently from other creditors because debtors often had only one source from which they could obtain certain services. *See Whittaker*, 882 F.2d at 794 ("The subject matter of § 366 received special treat-

---

**18.** Merriam–Webster's Collegiate Dictionary, Tenth Ed. (2001).

**19.** *Id.*

ment because Congress recognized both that utility service is essential to a minimally acceptable standard of living and that such services are often available only from a single source.")

The parties stipulated that there are other telephone companies that provide the same or equivalent services to commercial customers in Pennsylvania.[20] Allegiance argues strenuously—perhaps accurately—that deregulation of telephone service and other utilities has changed the industry dramatically since the legislative history for Section 366 was written by opening the market to alternate telephone service providers.

 I cannot accept Allegiance's argument that it is not a utility for two reasons. First, I find no ambiguity in the language of Section 366 and, therefore, under commonly-used rules of statutory construction, there is no reason to look to the legislative history for further guidance. *In re First Merchants Acceptance Corp.*, 198 F.3d 394, 402 (3d Cir.1999); *Whittaker*, 882 F.2d at 795. The United States Supreme Court has stated that the starting point for statutory construction "must be the language employed by Congress ... and we assume 'that the legislative purpose is expressed by the ordinary meaning of the words used.'" *American Tobacco Company v. Patterson*, 456 U.S. 63, 68, 102 S.Ct. 1534, 71 L.Ed.2d 748 (1982) (citations omitted). Clear statutory language cannot be overcome by contrary legislative history. *First Merchants.*, 198 F.3d at 402, *citing United States v. Gonzales*, 520 U.S. 1, 8, 117 S.Ct. 1032, 137 L.Ed.2d 132 (1997); *cf. American Tobacco Co.*, 456 U.S. at 68, 102 S.Ct. 1534 ("Ab-

sent a clearly expressed legislative intention to the contrary, [the statute's] language must ordinarily be regarded as conclusive.") (citations omitted). Allegiance is a "utility" within the ordinary meaning of that term, since it provides telephone service to the public and is subject to regulation by the FCC and the Pennsylvania PUC.

Second, even if I accept Allegiance's view of legislative history and of market changes, neither justifies the result sought by Allegiance.

Notwithstanding the legislative history, the term "utility" was, from the beginning, given a broad meaning. In *In re Good Time Charlie's Ltd.*, 25 B.R. 226 (Bankr. E.D.Pa.1982) (Twardowski, J.), the chapter 11 debtor operated a restaurant as a tenant in a shopping center. The court decided that the term "utility" applied to the shopping center owner who was supplying electricity to the chapter 11 debtor,[21] writing:

> We feel that the defendant clearly occupies a "special position with respect to the debtor" in its role as the debtor's electricity supplier. Because of PP & L's existence, the defendant does not, strictly speaking, constitute a monopoly as an electricity supplier vis-a-vis the debtor. However, the debtor would be forced to incur a large and very possibly prohibitive expense in the form of rewiring, among other things, if it were required to seek electrical service directly from PP & L. Therefore, we are convinced that the debtor "cannot easily obtain comparable service" from PP & L.

*Good Time Charlie's*, 25 B.R. at 227.[22] I agree with Judge Twardowski's analysis of

---

**20.** Joint Pretrial Statement, p. 2 at ¶ 3.

**21.** The owner obtained electrical service from Pennsylvania Power and Light ("PP & L"), which was the only public utility providing

electric service in the area.. *Good Time Charlie's*, 25 B.R. at 227.

**22.** *See also In re Hobbs*, 20 B.R. 488 (Bankr.E.D.Pa.1982)(Goldhaber, J.) (Court

"utility;" it is consistent with the ordinary meaning of "utility" as discussed above. More recent decisions apply Section 366 to telephone service providers.[23]

Even in the face of asserted market changes, Section 366 still must balance the debtor's need for continued access to necessary services, such as electricity, gas or telephone service, against the rights of the utility companies to adequate assurance of payment. *In re Moorefield*, 218 B.R. 795, 796 (Bankr.M.D.N.C.1997). One Stop argued that its telephone service was necessary for its business operations and that it could not easily obtain comparable telephone service from another provider. Ms. Bradford testified that she had contacted another provider for telephone service after Allegiance suspended service. She abandoned that effort when she was advised that she could not keep the same telephone numbers and that it would take two weeks to get such service,[24] a delay potentially fatal to One Stop's ability to conduct its business, for which business communication with clients and customers was essential.[25] While Allegiance's attorney appeared to challenge her belief that she could not keep the same telephone numbers,[26] Allegiance did not produce evidence showing that One Stop could, in fact, switch providers and maintain the same telephone numbers.

The evidence presented demonstrated that the debtor could not easily obtain comparable services. Therefore, whether I look to the statutory language alone, delve into the legislative history, and/or recognize changes in the business landscape, I conclude that Allegiance is a "utility" subject to Section 366.

II. *The debtor's bankruptcy filing required Allegiance to restore telephone service prior to obtaining an adequate assurance payment.*

■ The Third Circuit Court of Appeals has held that Section 366 requires a utility that has terminated service prior to the

held that a condominium association that provided electricity service to condominium owners was a "utility" under Section 366).

**23.** *In re Conxus Communications, Inc.*, 262 B.R. 893, 899 (D.C.Del.2001); *and see In re Tel–Central Communications, Inc.*, 212 B.R. 342 (Bankr.W.D.Mo.1997)(Telephone services provider argued that it was not a "utility" under Section 366 upon an emergency motion by the debtor to establish a reasonable security deposit, but then changed its position and argued that it was a utility in the context of a motion to pay post-petition indebtedness as an administrative expense.) Aside from the case *In re Moorefield*, 218 B.R. 795 (Bankr.M.D.N.C.1997), which found that a cable services provider was not a "utility" for the reason that it was not providing a necessary service, our research has not uncovered any cases considering this issue in the wake of deregulation. Early drafts of the Bankruptcy Reform Act appeared to address this issue directly by adding a definition of "utility" as subsection (c) of Section 366 as follows:

(c) For the purposes of this section, the term 'utility' includes any provider of gas, electric, telephone, telecommunication, cable television, satellite communication, water, or sewer service, whether or not such service is a regulated monopoly.

1998 Cong. U.S.H.R. 3150, 105th Cong., 2nd Sess. at § 119 (June 10, 1998). However, this revised definition does not appear in later drafts of the Bankruptcy Reform Act. *See* Bankruptcy Reform Act, 11 U.S.C. House Bill § 366, H.R. 333, 107th Cong. (2000); 11 U.S.C. Senate Bill § 366, S.420, 107th Cong. (2000). I offer no comment upon whether such a revision is a needed response to market changes. Neither do I attribute any usefulness to this one-time proposed amendment in resolving the issue before me.

**24.** Tr. at pp. 102–03.

**25.** Tr. at p. 62.

**26.** Tr. at pp. 102–03.

filing of a bankruptcy petition, to restore service upon a debtor's request within 20 days of the bankruptcy petition filing. *Whittaker*, 882 F.2d at 793. The service must be restored without prior receipt of the debtor's adequate assurance payment. *Id.* at 794. The *Whittaker* Court concluded that "Congress apparently wanted a debtor to have access to essential utility services ·for a short period of time while avenues for the provision of adequate assurance could be pursued." *Id.*

Clearly, under *Whittaker*, Allegiance was required to restore service to One Stop as soon as One Stop requested the service after filing its chapter 11 bankruptcy. Allegiance argues that the debtor did not provide it with notice of its chapter 11 filing and, therefore, it did not willfully violate Section 366 by failing to refuse to restore telephone service. However, the testimony of the witnesses, the briefs, exhibits and logic all lead to the conclusion that One Stop did advise Allegiance of its chapter 11 filing, either on or shortly after the filing date.

Ms. Bradford testified that she contacted Allegiance after filing One Stop's chapter 11 bankruptcy petition and asked that service be restored.[27] In its Post–Trial Memorandum, Allegiance argued that Ms. Bradford's trial testimony about contacting Allegiance after filing the chapter 11 petition is unreliable because her responses at trial contradicted testimony given during a deposition on May 10, 2001.[28] However, upon a complete review of Ms. Bradford's deposition testimony regarding the chapter 11 filing, I find that deposition testimony is not inconsistent with the trial testimony.[29] Ms. Bradford's testimony at the

27. Tr. at p. 25.

28. The transcript of the May 10, 2001 deposition was admitted into evidence as Exhibit D–26.

29. Allegiance points to Ms. Bradford's deposition testimony in which she said that she called Ms. Bridges, who was a collections person at Allegiance, from a telephone booth immediately after the chapter 11 petition was filed. (Exhibit D–26, p. 43). This contradicts her testimony at the May 17, 2001 trial, at which Ms. Bradford testified that she left a voice mail message for Ms. Shelton, Allegiance's collection manager, after filing the chapter 11 bankruptcy. (Tr. at p. 75). However, Ms. Bradford corrected her conflicting deposition testimony at the deposition. When Ms. Bradford was asked more specifically about the contact with Ms. Bridges, she followed up her answer as follows:

Q: And what did Ms. Bridges tell you [after being told about the chapter 11 filing]?

A: I think at that point I was no longer talking to her. I believe that I was trying to connect with her supervisor. They told me it had to be reviewed by the attorneys and they didn't give me any immediate relief, no.

Exhibit D–26 at p. 44. Ms. Bradford's follow-up testimony—that she was trying to connect with the supervisor—is consistent with her trial testimony. Furthermore, at trial, Ms. Bradford testified that she tried to contact Allegiance daily, sometimes more than once a day, to have service restored after the chapter 11 filing. (Tr. at p. 75) Because she contacted Allegiance more than once, her recollection of Allegiance's response (or lack thereof) to each and every call understandably might vary.

Allegiance also argues that Ms. Bradford's claim that she called Allegiance immediately after the chapter 11 filing conflicts with other deposition testimony in which Ms. Bradford claimed that Mr. Saline called Allegiance to advise of the chapter 11 filing. (Exhibit D–26, p. 50–51). However, Allegiance's electronic account notes corroborate Ms. Bradford's statement, because they show that Mr. Saline spoke to Ms. Shelton of Allegiance on October 3, 2000, the day after the chapter 11 filing. (Exhibit D–19). It is credible that both events occurred, i.e. Ms. Bradford left a voice mail immediately following the chapter 11 filing *and* Mr. Saline called the following day to request that service be restored. Allegiance, however, points out that Ms. Bradford's deposition testimony claims Mr. Saline spoke to Ms. Bridges, not Ms. Shelton. The

May 17, 2001 trial that she filed her chapter 11 for the sole purpose of obtaining restoration of the telephone service so that she could continue (or save) her business is both credible and logical.[30]

■ It is less clear whether Ms. Bradford faxed a copy of the chapter 11 bankruptcy petition to One Stop.[31] However, it is not necessary to provide a creditor with written notice of the bankruptcy filing. Some courts have held that notice of a bankruptcy filing by telephone is sufficient notice to the creditor, so that any later acts in violation of the stay would be considered "willful" violations. *In re Patterson*, 263 B.R. 82, 91 (Bankr.E.D.Pa.2001)(Sigmund, J.). *Accord In re Meis–Nachtrab*, 190 B.R. 302, 306 (Bankr.N.D.Ohio 1995); *In re Coons*, 123 B.R. 649, 651–52 (Bankr.N.D.Okla. 1991); *In re Sermersheim*, 97 B.R. 885, 889 (Bankr.N.D.Ohio 1989). I find it logical that, facing the potential demise of her ability to conduct business, Ms. Bradford told Allegiance about the chapter 11 filing in her various telephone contacts with Allegiance after the filing on October 2, 2000. I also find that debtor's counsel advised Allegiance of the chapter 11 bankruptcy by telephone on October 24, 2000, yet Allegiance still refused to restore service.[32] Regardless of whether Ms. Bradford faxed a copy of the chapter 11 petition to Allegiance, the telephonic notice of the filing to Allegiance by Ms. Bradford and her counsel was sufficient to require Allegiance to restore service to the debtor *prior* to re-

deposition testimony, however, was not given in response to questions specifically asking about giving notice to Allegiance of the chapter 11 bankruptcy filing; instead, it was given in response to a question asking Ms. Bradford to identify Mr. Saline and describe his involvement in the case. (Exhibit D–26, p. 50). Her deposition testimony about Mr. Saline's conversation with Ms. Bridges is consistent with her trial testimony about giving notice to Allegiance about her personal *chapter 7* bankruptcy filing. (Tr. at p. 74 and pp. 95–97). It does not strain the imagination to find that Ms. Bradford may have confused the chapter 7 and the chapter 11 filings in her deposition testimony. Rather, it would defy reason to accept Allegiance's assertion that Ms. Bradford never called to tell Allegiance of the chapter 11 filing, since she testified credibly that her sole purpose for filing chapter 11 was to have the telephone service restored. (Tr. at pp. 74–75 and p. 102).

30. Tr. at pp. 74–75 and p. 102. It is also difficult to find that Allegiance did not have notice of the chapter 11 filing when its own electronic account notes show that Allegiance required payment of the entire past due balance to restore service on September 21, 2000, but only required a three month deposit to restore service on October 3, 2000, which is the day after the chapter 11 filing. (Exhibit D–19). It is logical to draw from this the inference that, because the nature of Allegiance's payment demand changed to one resembling an "adequate assurance payment," Allegiance *knew* of the chapter 11 filing.

31. Although Ms. Bradford testified that she faxed a copy of the chapter 11 petition to Allegiance immediately (Tr. at p. 75), she admitted that she had no evidence of the fax transmission (Tr. at p. 102). Allegiance argues that her inability to provide evidence of the fax should lead to an adverse inference that such evidence would be unfavorable, citing to *Interstate Circuit v. United States*, 306 U.S. 208, 226, 59 S.Ct. 467, 83 L.Ed. 610 (1939); *International Union ("UAW") v. NLRB*, 459 F.2d 1329, 1335 (D.C.Cir.1972) and other cases regarding the adverse inference rule. However, because I find that written notice of the filing was not necessary, I need not consider whether the adverse inference rule should apply here.

32. Allegiance argues that the contact from Debtor's counsel came after the 20–day period prescribed by Section 366(b) and, therefore, Allegiance was not required to restore service pursuant to this contact. However, because I find that the Debtor asked Allegiance to restore service throughout the 20–day period, contact from the Debtor's counsel outside of that period does not, under these circumstances, relieve Allegiance of its obligations.

ceipt of any adequate assurance payment. *Whittaker*, 882 F.2d at 794.

### III. *Allegiance's failure to restore service is not a violation of the automatic stay of 11 U.S.C. § 362.*

■ One Stop argues that Allegiance's refusal to restore service is a violation of Bankruptcy Code Sections 362(a)(1) and (a)(6), thereby giving rise to a damage claim under Bankruptcy Code Section 362(h). Those subsections of Section 362(a) provide as follows:

(a) Except as provided under subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, ...operates as a stay, applicable to all entities, of—

(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

....

(6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title;

One Stop did not present any evidence that Allegiance took any action after the filing of the chapter 11 petition to collect the pre-petition debt or that Allegiance took any other action prohibited by Section 362(a)(1) or (6). Instead, the evidence presented by One Stop shows that Allegiance refused to restore service without a deposit or advance payment in violation of Section 366.[33] Therefore, the damage provision for willful violations of the automatic stay set forth in Section 362(h) is not available to the debtor under these circumstances.[34]

■ I now turn to the debtor's request for the award of actual and punitive damages pursuant to this Court's "inherent power to punish contempt of the automatic stay." *See* Complaint, p. 2. The District Court in *Whittaker* refused a similar request, noting "Whittaker cites no case which has extended contempt penalties for violation of an automatic stay to other situations." *Whittaker*, 92 B.R. at 117. The District Court in *Whittaker* further held that:

I conclude that the violation of § 366 was not conduct in contempt of a court order. Courts have held parties in contempt for the violation of the automatic stay provision of the bankruptcy code, 11 U.S.C. § 362, because of the special nature of that provision. The automatic stay is comparable to an automatic injunction. It acts as a specific and definite order of a court to restrain creditors from continuance of judicial process or collection efforts against the debtor...However, section 366 is not compa-

---

**33.** Tr. at p. 76 and p. 154. *See also* Exhibit D–19.

**34.** *In re Smith*, 170 B.R. 111 (Bankr.N.D.Ohio 1994) has been cited for the proposition that the consequences of a violation of Section 366 are similar to those that are imposed for a violation of the automatic stay under Section 362(h). *See* 3 Collier on Bankruptcy, ¶ 366–8 (15th Ed.2001). However, the *Smith* bankruptcy case was converted from chapter 13 to chapter 7. The *Smith* Court found that the utility's post-conversion termination for nonpayment of pre-conversion debt was precluded by Section 348 and was a willful violation of the automatic stay. *Smith*, 170 B.R. at 115–16. Therefore, *Smith* does not provide a valid basis for imposing damages under Section 362(h) for a violation of Section 366 under these circumstances.

rable to an automatic injunction, nor is it a court order of any kind.

*Whittaker,* 92 B.R. at 117, *aff'd Whittaker,* 882 F.2d at 796. I agree with the District Court's reasoning. The contempt remedy is not available to the debtor under these circumstances.

■ But the analysis of the debtor's remedies should not end there. Section 366 of the Bankruptcy Code does not include an express remedy for damages caused by a Section 366 violation. The debtor did not seek damages under Section 366; neither did Allegiance argue that no relief is available for a Section 366 violation. There seems to be little case law on this issue, but the Court of Appeals decision in *Whittaker* does provide guidance. Compensatory damages for the violation of Section 366 were awarded by the bankruptcy court in *Whittaker,* and this decision was affirmed on appeal by the District Court and Third Circuit Court of Appeals. *Whittaker v. Philadelphia Electric Co.,* 92 B.R. 110, 115–16 (E.D.Pa.1988) *aff'd* 882 F.2d 791, 796–97 (3d Cir.1989).[35] I therefore hold that a debtor is entitled to compensatory damages suffered as a result of a Section 366 violation. One Stop will be given an opportunity to present evidence of compensatory damages, if any, caused by Allegiance's failure to comply with Section 366.

IV. *Conclusion.*

For the reasons set forth above, I conclude that (1) Allegiance is a utility subject to the provisions of Section 366; (2) Allegiance violated Section 366 by failing to restore service to One Stop after One Stop filed a chapter 11 bankruptcy petition and requested that service be restored; and (3) Allegiance did not violate the automatic stay provision of Section 362(a) when it failed to restore service as required by Section 366. One Stop will be provided an opportunity to provide evidence of any compensatory damages it suffered based upon Allegiance's violation of Section 366. An appropriate order follows.

---

**35.** Arguably, the Court's authority under Section 105(a) of the Bankruptcy Code could also serve as the basis for awarding damages for a Section 366 violation:

(a) The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.

No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.